**In re J.A.S., Jr., a Minor.**

**Appeal of Children, Youth and Families.**

Superior Court of Pennsylvania.

Argued Feb. 13, 2003.

Filed March 24, 2003.

Wendy L. Vaupel, Pittsburgh, for appellant.

Armand R. Velez, Pittsburgh, for B.C., appellee.

Raymond N. Sanchas, Pittsburgh, for J.A.S., Sr., appellee.

Stephen B. Dittmer, Pittsburgh, for J.A.S., Jr., appellee.

Before MUSMANNO, LALLY–GREEN and TAMILIA, JJ.

OPINION BY TAMILIA, J.:

¶ 1 Allegheny County Children, Youth and Families (CYF) appeals the June 11, 2002 Order denying its petition to terminate the parental rights of B.M.C. (mother) and J.A.S., Sr. (father).

¶ 2 The child was born on February 23, 1999 and was hospitalized four months later, diagnosed with a condition referred to as "failure to thrive." Thereafter the child was placed with his paternal grandmother, L.W. After L.W. contacted CYF regarding her care of the child,[1] the child was returned to the parents; however, two months later the child was removed. During the two months that he was in his parents' custody, the child again evidenced a failure to thrive and, at fifteen months of age, had lost twelve ounces. The child was adjudicated dependent on August 11, 1999.

¶ 3 The parents are not married and do not appear to be in a relationship. Both are mentally challenged and the child evidences developmental difficulties as well. Mother has been diagnosed as borderline retarded and father has a brain stem disorder which impairs his cognitive functions. The child's developmental impairments require his participation in speech therapy, developmental therapy and a functional feeding program.

¶ 4 Pursuant to the reunification goals of the family service plan (FSP), parents were provided with in-home services, parenting classes and instructions on basic parenting skills. Father was instructed to attend anger management classes as well as nurturing classes.

¶ 5 In February 2001, the FSP goal was changed to concurrent planning. After finding parents had failed to progress toward the goals set forth in the FSP despite two years of services, the juvenile court changed the goal of the FSP to adoption in May 2001. On June 29, 2001,

---

**1.** The parties dispute the substance of the paternal grandmother, L.W.'s conversation with Allegheny County Children, Family and Youth regarding care of the child. This matter is more fully discussed later in this Opinion.

CYF filed a petition for involuntary termination of appellees' parental rights.

¶ 6 Following evidentiary hearings on December 4, 2001, March 5, 2002, April 26, 2002 (a dispositional review hearing by the juvenile court regarding placement) and June 11, 2002, the orphans' court denied CYF's petition for involuntary termination of appellees' parental rights, finding "CYF did not provide clear and convincing evidence that the statutory authority for termination of parental rights existed nor did CYF provide evidence that termination of the parental rights would meet the needs and welfare of the child." Orphans' Court Opinion, Todd, J., 9/10/02, at 3.

¶ 7 CYF presents the following challenges to the orphans' court's Order.

I. The Orphans' Court erred and abused its discretion by denying CYF's petition for involuntary termination of parental rights under 23 Pa.C.S.A. § 2511(a)(2), (a)(5) and (a)(8), as CYF clearly and convincingly proved that appellees cannot meet their "irreducible minimum requirements" in parenting this child.

II. The Orphans' Court erred and abused its discretion by denying CYF's petition for involuntary termination of parental rights under 23 Pa.C.S.A. § 2511(b), as termination clearly and convincingly meets the developmental, physical and emotional needs and welfare of this child.

III. The Orphans' Court erred and abused its discretion by permitting irrelevant testimony concerning the child's placement to improperly influence its decision to deny CYF's petition for involuntary termination of parental rights. The Orphans' Court lacked jurisdiction to make dispositional findings pursuant to 42 Pa.C.S.A. § 6351 et

seq., and usurped the authority of the juvenile court by rejecting that court's finding that the child remain in his adoptive placement.

Appellant's brief at 4.

¶ 8 " 'The standard of review in cases involving the termination of parental rights is limited to the determination of whether the orphans' court's decree is supported by competent evidence.' " *In re J.D.W.M.*, 810 A.2d 688, 690 (Pa.Super.2002), *quoting In re Adoption of J.D.S.*, 763 A.2d 867, 870 (Pa.Super.2000).

¶ 9 As the party seeking termination, CYF bore the burden of establishing, by clear and convincing evidence, that grounds existed for terminating appellees' parental rights. " 'The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue.' " *Id.*, *quoting In re Adoption of C.A.W.*, 453 Pa.Super. 277, 683 A.2d 911, 914 (1996), *appeal denied*, 548 Pa. 631, 694 A.2d 619 (1996).

¶ 10 In pertinent part, 23 Pa.C.S.A. § 2511, Grounds for involuntary termination, provides:

(a) **General rule.**—the rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

(b) **Other considerations.**—the court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

¶ 11 Above all else in determining whether parental rights should be terminated, adequate consideration must be given to the needs and welfare of the child. *In re J.D.W.M., supra, citing In re Child M.*, 452 Pa.Super. 230, 681 A.2d 793 (1996), *appeal denied*, 546 Pa. 674, 686 A.2d 1307 (1996).

¶ 12 As previously discussed, the child has been diagnosed with a condition referred to as "failure to thrive."

Failure to thrive (nonorganic, NOFTT; also called psychosocial failure to thrive) is defined as decelerated or arrested physical growth (height and weight measurements fall below the fifth percentile, or a downward change in growth across two major growth percentiles) associated with poor developmental and emotional functioning. Organic failure to thrive occurs when there is an underlying medical cause. Nonorganic (psychosocial) failure to thrive occurs in a child who is usually younger than 2 years old and has no known medical condition that causes poor growth.

Psychological, social, or economic problems within the family almost always play a role in the cause of NOFTT. Emotional or maternal deprivation is often related to the nutritional deprivation. The mother or primary caregiver may neglect proper feeding of the infant because of preoccupation with the demands or care of others, her own emotional problems, substance abuse, lack of knowledge about proper feeding, or lack of understanding of the infant's needs.

. . .

The first year of life is an important time for brain growth. Children with NOFTT that are not treated for an extended period of time may have difficulty "catching up" developmentally and socially. About 50 percent of children who experienced failure to thrive as an infant or young child continue to have

social and emotional problems or eating problems later in life.

The individual issues involved in causing NOFTT are almost always complex. Treatment planning usually requires the involvement of a pediatrician, nutritionist, social worker, physical or occupational therapist, and a psychiatrist or other qualified mental health provider. Children's Hospital of Pittsburgh, Child Health Library—Growth and Development (*see* www.chp.edu).

¶ 13 At the March 5, 2002 hearing, child psychiatrist, Dr. Robert Lowenstein, testified that mother failed to exhibit an acceptable level of parenting skills. Specifically, Dr. Lowenstein made the following observations:

- mother presented herself in a defensive, irritable and immature manner;
- mother's play with the child was hyperstimulatory;
- mother was unaware of the obvious need to change the child's soiled diaper;
- mother's knowledge of the child's development was incomplete; and
- mother failed to demonstrate basic parenting skills.

The record also reveals that mother is being treated with anti-depressants and anti-psychotic medication.

¶ 14 Dr. Lowenstein made similar observations with respect to father. He testified that father's interactions were inappropriate in the sense that the interaction focused upon roughhousing play to the exclusion of any other type of interaction.

¶ 15 CYF case worker, Michele Haney, testified that the parents had explained the child's weight loss while in their care by stating that the child was a "difficult feeder." It was clear that among the problems parents had with caring for the child and maintaining a safe and appropriate home for him, they were having difficulty understanding how to feed the child and how frequently the child needed to be fed.

¶ 16 Heather Tunney, the in-home services provider to the parents in this case, testified that after numerous unsuccessful attempts to contact and meet with the parents, she was able to meet with the family and set up in-home service on an average of twice a week. Tunney explained her assistance to the family as follows.

I would have one visit a week minimum with the family without the child there. During that visit, I worked on parenting skills, parenting education, nutritional education, working with the family to identify appropriate play activities, working with—addressed safety concerns in the home, working to encourage mother's mental health scheduling of appointments, and maintaining of her mental health, and anger management with father. I also would visit weekly on Wednesdays when the child was present in the home. At this time, the developmentalist from Alliance for Infants and Toddlers was also present for one hour of the visit. I would participate with the family in the developmental therapies so that I could appropriately encourage the family to follow through on the goals highlighted during that therapy and at that time worked specifically on nutrition and parenting with the child in the home.

. . .

First with nutrition, we approached that from kind of a gamut of educational materials. We worked with them to develop lists of appropriate food choices since there were concerns they were not feeding him appropriate foods. We also worked to develop a feeding schedule and significantly emphasized the need for them to adhere to that. [The child] was definitely non-verbal at that time.

He could not ask for food, and he was not making any effort to communicate any hunger or discomfort. He didn't cry when his diaper needed to be changed, and he doesn't indicate by pointing or reaching that he's hungry for food. So we emphasized the importance of offering him food regularly since he had no way of communicating what his needs were. We also would prepare meals and snacks with the parents and coach them on appropriate feeding techniques. We also did this in conjunction with the functional feeding program. We attended the evaluation with father at that appointment at the end of March, and then also attempted to follow through on recommendations in the home to encourage consistency among service providers.

. . .

I attempted to teach and show them basic child-proofing so that things that could be potential hazards to the child were removed or put in a safe place. There were several glass objects within reach of the child. We repeatedly encouraged them to move them. On one occasion, one did break while I was there. They also had a television balanced on a stand that was very narrow. So we encouraged them to put the wiring behind so that the child could not pull it down. There were a lot of exposed wires which were tripping hazards, and [the child] has a difficult time maintaining a steady gait, and he often trips, so we tried to remove tripping hazards, and also sharp corners from which he could bump his head. The stove door was a very light door that he could easily open, and the heating in their apartment they can't regulate, and it's very hot to touch, so we purchased gates that could go in front of the radiators so that [the child] would not be able to burn himself.

. . .

[T]hey used to make a play yard and confine the child inside this space, so instead of securing the area, they put him in a very small area and confined him, instead of removing the hazard.

. . .

The major source of my concern stemmed from their ability to provide adequate nutrition throughout the day because they were consistently not compliant with our recommendations and the recommendations of the Children's Institute in terms of their feeding practices, in terms of offering him meals and on several occasions, mother would report to me that she had not adhered to the feeding schedule that we had collectively set up. She also had repeatedly showed there were several occasions when he was being fed dinner just before 8:00 at night. She would say I didn't feed him a snack today because I'm going to feed him a big dinner, and we would continue to coach on that, that he's not an adult where you can do that. He doesn't have food stored. He's a small child, that he needs to be provided nutrition regularly throughout the day in order to continue to grow, maintain weight and have his needs met.

. . .

[W]henever [mother] would make such admittance, we would increase our education of nutritional awareness. I would also call, or if I wasn't present at that time during the visits, I would call to remind them to adhere to the schedule and would be told—on one occasion, I called to remind them it was time for a snack, and I was told there was no food in the house, although the day before when I had a visit, mom had specifically asked me to leave so that they could go grocery shopping.

. . .

[W]e provided [mother] with a calendar to document all of her [mental health] appointments. . . .

. . .

The goal was changed on May 3. However, CYF was willing to continue our service so that visits which were still in the home could continue to be enhanced and parenting skills developed, and we agreed to that. However, with the exception of one visit during which father was present and mother was not, and one visit when both parents were present, all subsequent visits had been cancelled by mother, and so for a period of over a month, we were not able to get into the home. We discussed this with CYF and they agreed to terminate our services since parents were not available or willing to cooperate with us.

. . .

My basic concern is that I do not feel assured that they will provide for his basic needs, primarily food and drink and safety, and I'm very concerned because they did not know that even with intensive services in their home, that on a long-term basis, I don't believe they would be capable of doing that[.]

(N.T., 12/4/01, at 54–63.)

¶ 17 Despite in-home services and other reunification plans and programs, the evidence established that the parents failed to progress toward the established goals.

¶ 18 Before discussing the evidence of the extended family's willingness to assist the parents in this case, we must address CYF's concerns regarding evidence of placement. " 'In a termination proceeding, the focus is on the conduct of the parents.' " *In the Interest of A.L.D.*, 797 A.2d 326, 339 (Pa.Super.2002), *quoting In the Interest of M.B.*, 449 Pa.Super. 507, 674 A.2d 702, 705 (1996), *appeal denied*,

547 Pa. 717, 688 A.2d 172 (1997). During the course of the hearings pertaining to termination of parental rights, evidence was elicited which pertained to matters before the juvenile court, namely placement issues. We agree with CYF's position that this evidence is not relevant for purposes of assessing the grounds for termination pursuant to 23 Pa.C.S.A. § 2511. The evidence was appropriate to the extent that it revealed the degree to which mother and father were assisted by father's extended family, but its weight fell much more heavily toward establishing that even with the support and involvement of extended family, the child did not substantially improve in his developmental progress until he was placed in a foster home *away* from *all* family members.

¶ 19 Father testified to his plan to move out of mother's apartment and reside with his mother, L.W., the child's paternal grandmother. L.W. cared for the child for seven to nine months and testified as follows with respect to her decision to rescind her care of the child.

I felt [father] and [mother] were becoming too comfortable with the idea of me taking the baby. Maybe **they weren't trying hard enough** . . . to get everything back together. And if I would return [the child], **they might feel like they are under a little bit of pressure to get their act together**.

(N.T., 3/5/02, at 22; emphasis added.) L.W. claimed to have sought custody of the child and to have requested to be a guardian for purposes of overseeing her son's (the father's) care of the child. *Id.* at 22–23.

¶ 20 A.H., father's uncle and the child's great-uncle, testified that he and his wife had expressed interest in adopting the child but that their interests were dismissed. When asked whether he and his wife would be willing to assist in caring for

the child in the event father's parental rights were not terminated, A.H. responded in the affirmative. These are considerations that were proposed and attempted during the FSP and for whatever reason failed to achieve a minimally adequate result and are not properly revisited in the termination proceeding.

¶ 21 As held in *In Re A.L.D.*, 797 A.2d 326 (Pa.Super.2002), the orphans court in a termination proceeding may not reintroduce a reunification plan, as that aspect of the matrix of dependency termination proceedings is final once the juvenile court has determined the statutory requirements of attempted reunification pursuant to the Juvenile Act, 42 Pa.C.S.A. § 6301(b) **Purposes** (1)(3), and section 6351, **Disposition of dependent child, (b), (e)** and **(f)** have been fulfilled pursuant to a permanency hearing with the court ordering a change of goal to termination and adoption. As stated in *Interest of M.B.*, 388 Pa.Super. 381, 565 A.2d 804 (1989), *appeal denied,* 527 Pa. 601, 589 A.2d 692 (1990) (emphasis added.):

> As a practical and legal matter, an order by the juvenile court changing the child's placement goal from reunification to adoption **ends any dispute that may exist between CYS and the parent as to the adequacy of CYS' services aimed at reuniting the parent with his/her children and, of course, as to whether CYS had selected the most appropriate goal for this family.** By allowing CYS to change its goal to adoption, the trial court has decided that CYS has provided adequate services to the parent but that he/she is nonetheless incapable of caring for the child and that, therefore, adoption is now the favored disposition. **In other words, the trial court order is the decision that allows CYS to give up on the parent.**

*Id.* at 807–08. Just as this Court, upon review, cannot substitute our judgment for that of a trial court, the orphans' court in termination proceedings cannot substitute its judgment for that of the juvenile court on the same factual issue.

In a termination proceeding, however, the focus of the Orphans' court is whether CYS has satisfactorily borne its statutory burden for termination under Section 2511; not to review the previous Juvenile court proceedings or change the service plan goal, because the service plan goal is not the issue before the Orphans' court. The Orphans' court's jurisdiction to terminate parental rights is derived from a different statute. Thus, in this context, the issues and purposes of the proceedings before the Juvenile court and the Orphans' court are wholly distinct.

*In Re A.L.D., supra* at 339.

¶ 22 This Court has carefully and thoughtfully reviewed this evidence and arrived at the conclusion that while the extended family may be well-intentioned with respect to the care of the child, neither mother nor father was able to provide for the child despite the assistance and support of extended family. Moreover, the record reveals that only while in his pre-adoptive home has the child developed well and shown general signs of overall improvement.

The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and may properly have his or her rights terminated.

*In re B.L.L.*, 787 A.2d 1007, 1013 (Pa.Super.2001), *citing In re Diaz*, 447 Pa.Super. 327, 669 A.2d 372 (1995).

¶ 23 Review of the evidence presented clearly and convincingly demonstrates that, despite support, extensive in-home services, assistance (provided by Allegheny County resources as well as extended family) and abundant time to remedy the problems which necessitated the child's removal from the parents' custody, neither parent is able to meet the irreducible minimum requirements of care for the child. While we find this conclusion to be unfortunate and understand the disheartening effect it will have to the parents and their extended family, that does not make it any less appropriate, for it is the needs and welfare of the child that are of paramount concern to this Court. As we said in *In Re B.L.L.*, *supra* at 1013, *citing In Interest of Lilley*, 719 A.2d 327 (Pa.Super.1998), "A parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy safe environment."

¶ 24 Upon careful review of the evidence presented, we find the orphans' court abused its discretion in failing to decree the termination of the parental rights of mother, B.M.C. and father, J.A.S., Sr. We find CYF satisfied its burden of proving by clear and convincing evidence that termination of parental rights is appropriate in this case and that the needs and welfare of the child are best served by termination. Again, we refer to *In Re B.L.L.* for the philosophical base which now governs termination proceedings.

> Foster home drift, one of the major failures of the child welfare system, was addressed by the federal government by a commitment to permanency planning, and mandated by the law of Pennsylvania in its participation in the Adoption and Safe Families Act of 1997 (Public Law 105–89, 111, Stat. 2119). Succinctly, this means that when a child is placed in foster care, after reasonable efforts have been made to reestablish the biological relationship, the needs and welfare of the child require CYS and foster care institutions to work toward termination of parental rights, placing the child with adoptive parents. It is contemplated this process should realistically be completed within 18 months.

*Id.* at 1016.

¶ 25 J.A.S. has been in foster care almost since his birth four years ago. A child diagnosed with "failure to thrive", as detailed above, requires complex and extensive care in these, the early development years, if his future is to be healthy and secure. Any further delay or experimentation as propounded by the trial court would be devastating to J.A.S.

¶ 26 We reverse the June 11, 2002 Order and remand this matter to the orphans' court. We hereby direct the orphans' court to enter a Decree terminating the parental rights of both parents forthwith but no later than fifteen (15) days following the date of this Opinion.

¶ 27 Order reversed; case remanded with instructions.

¶ 28 Jurisdiction relinquished.