J-S07001-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: L.N.B.-G., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| APPEAL OF: L.S.G., FATHER, | |
| Appellant | No. 1473 MDA 2015 |

Appeal from the Decree July 28, 2015
In the Court of Common Pleas of Lancaster County
Orphans' Court at No(s): 2115 of 2014

BEFORE: BOWES, OTT, AND FITZGERALD,* JJ.

MEMORANDUM BY BOWES, J.:                    **FILED FEBRUARY 16, 2016**

L.S.G. ("Father") appeals from the orphans' court order entered on July 28, 2015, which terminated his parental rights to his daughter, L.N.B.-G.[1] We affirm and grant counsel leave to withdraw from representation.

L.N.B.-G. was born during August 2009, while Father and S.N.B. ("Mother") resided as an intact family with L.N.B.-G.'s half-sister, who was approximately one year old. Lancaster County Children and Youth Services ("CYS") first contacted the family during April 2012 in response to concerns

_____

[1] On June 2, 2015, the orphans' court terminated the parental rights of L.N.B.-G.'s mother, S.N.B., in absentia. We do not address that order.

* Former Justice specially assigned to the Superior Court.

of domestic violence between Mother and Father. The incident led to Father's incarceration due to a violation of probation. Thereafter, during August 2012, CYS interceded again after Mother and the maternal grandmother engaged in additional instances of domestic violence while Father was incarcerated. The juvenile court granted CYS temporary custody of L.N.B.-G. and her half-sister on August 3, 2012, and it adjudicated both girls dependent on September 4, 2012. The children have remained in the same pre-adoptive foster home since their initial placement.

Since L.N.B.-G.'s birth, Father has been incarcerated intermittently for over thirty months. For example, Father was imprisoned for ten months during 2010 for a parole violation and seven months during 2012 following the above-referenced dispute with Mother. Father was released during November of 2012 but was imprisoned again on February 8, 2013 and May 23, 2013. He was most recently incarcerated during September 2013, and as of the date of the evidentiary hearing, he was still serving that sentence.

Father's incarceration at the time of L.N.B.-G.'s initial placement made it difficult for CYS to assess his parenting situation. However, during Father's sporadic discharge from prison, the agency was able to develop a permanency plan for his benefit. Father was required to: (1) improve his mental health; (2) remain crime free and avoid domestic violence; (3) abstain from drugs and alcohol abuse; (4) employ good parenting skills; (5)

achieve financial stability; (6) obtain appropriate housing; and (7) maintain an ongoing commitment to his daughter.

Father's adherence to the permanency plan was dismal. He overdosed on opiates during February 2013, and was incarcerated for at least one drug offense. Father attempted mental health and drug abuse treatment, but he was discharged without completing the program after he assaulted another patient. Absent compliance with the mental health and substance abuse components of the permanency plan, Father was not eligible to participate in parenting programs. Likewise, Father failed to confront his domestic violence issues, achieve financial stability, obtain suitable housing, or forsake his life of crime. Father violated parole episodically. Over the course of the dependency proceedings, Father visited with L.N.B.-G. on only four occasions. However, he did mail correspondence to her approximately twice per month and maintained contact with the agency when he was not in prison.

On October 14, 2014, CYS filed a petition to terminate Father's parental rights to L.N.B.-G. pursuant to § 2511(a)(1), (2), (5), (8) and (b). Father was represented by Jeremy S. Montgomery, Esquire, who was appointed on January 7, 2014, as part of the dependency proceedings. Father indicated his desire to consent to voluntary termination. However, after the orphans' court continued the portion of the hearing relating to Father so that CYS could provide him with the necessary documents, he

ultimately declined to relinquish his parental rights. During the rescheduled termination hearing, CYS presented testimony from the CYS caseworker assigned to the family, L.N.B.-G.'s outpatient therapist, and her court appointed special advocate ("CASA").

Father participated in the hearing by telephone from SCI-Coal Township and testified on his own behalf. The orphans' court discounted Father's testimony regarding the programs that he completed while incarcerated, noting that Father had snubbed CYS's request for him to document his accomplishments. Similarly, while Father presumed that his release from prison was imminent, he did not identify a specific date for that event. He indicated that he served his minimum term of imprisonment but still needed to complete a class and obtain the facility's approval before he could reappear before the parole board. The orphans' court did not share Father's optimism, however, and it concluded that, at best, Father's release date was uncertain.

Following the close of evidence, the orphans' court ruled from the bench that CYS established by clear and convincing evidence the statutory grounds to terminate Father's parental rights pursuant to § 2511(a)(1), (2), (8), and (b). On July 28, 2015, the court subsequently entered a written decree that omitted any reference to the grounds for termination under subsection (a)(8). This timely appeal followed. Father complied with Pa.R.A.P. 1925(a)(2)(i) by filing a concise statement of errors complained of

on appeal that challenged the orphans' court's determinations regarding § 2511(a)(1), (2), and (b).

On October 30, 2015, Attorney Montgomery filed an *Anders* brief and petition to withdraw from representation. *See Anders v. California*, 386 U.S. 738 (1967), and *Commonwealth v. McClendon*, 434 A.2d 1185 (Pa. 1981). We may not address the merits of the appeal without first reviewing the request to withdraw. *Commonwealth v. Rojas*, 874 A.2d 638, 639 (Pa.Super. 2005). Accordingly, we review Attorney Montgomery's petition at the outset.

In *In re V.E.*, 611 A.2d 1267 (Pa.Super. 1992), this Court extended the *Anders* principles to appeals involving the termination of parental rights. We stated that counsel appointed to represent an indigent parent on appeal from a decree involuntarily terminating parental rights may, after a conscientious and thorough review of the record, petition this Court for leave to withdraw from representation and submit an *Anders* brief. *Id*. at 1275. In *Commonwealth v. Santiago*, 978 A.2d 349, 361 (Pa. 2009), our Supreme Court altered our application of the *Anders* briefing requirements to permit counsel to fully articulate his or her conclusion that the appeal is frivolous.

The *Santiago* Court did not change the remaining procedural requirements that court-appointed counsel must satisfy in requesting to withdraw from representation, *i.e.*: (1) petition the court for leave to

withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; (2) furnish a copy of the brief to the defendant; and (3) advise the defendant of his or her right to retain new counsel or raise any additional points that he or she deems worthy of the court's attention.

Herein, Attorney Montgomery's petition to withdraw from representation stated that he had made a conscientious review of the record and had concluded that the appeal was wholly frivolous. In addition, Attorney Montgomery attested that he mailed to Father: a copy of the petition to withdraw; a copy of the **Anders** brief stating the reasons for his conclusion; and a letter advising Father of his rights to proceed *pro se* or to retain private counsel if the petition is granted and to raise any additional issues that he deemed worthy of consideration.[2] Significantly, with respect to the latter requirement, Attorney Montgomery attached to his petition a copy of the letter he mailed to Father advising him of his rights. **See Commonwealth v. Millisock**, 873 A.2d 748, 752 (Pa. Super. 2005). Thus, counsel has satisfied the procedural requirements of **Anders**.

Having found procedural compliance, we now must determine whether Attorney Montgomery's **Anders** brief complies with the substantive dictates outlined in **Santiago**. We conclude that it does. Attorney Montgomery's

---

[2] Father neglected to respond to counsel's letter or the petition to withdraw.

*Anders* brief 1) summarized the procedural history and pertinent facts with citation to the certified record; 2) identified the testimony adduced during the evidentiary hearing that arguably supports the appeal and outlines potential claims that the certified record does not sustain the statutory grounds for termination; and 3) referenced controlling case law in setting forth his conclusion that the appeal is frivolous because the competent evidence supports the orphans' court's determination that CYS satisfied its statutory burden and that terminating Father's parental rights is in his daughter's best interest.  Accordingly, Attorney Montgomery satisfied the *Santiago* requirements.

Next, we turn to whether Father's appeal is, in fact, frivolous.  Our standard of review is well settled.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record.  If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion.  A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  The trial court's decision, however, should not be reversed merely because the record would support a different result.  We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Involuntary termination of parental rights is governed by § 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938. As the party petitioning for termination of parental rights, CYS "must prove the statutory criteria for that termination by at least clear and convincing evidence." *In re T.R.,* 465 A.2d 642, 644 (Pa. 1983). Clear and convincing evidence is defined as "testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Matter of Sylvester,* 555 A.2d 1202, 1203–04 (Pa. 1989).

As noted, the orphans' court terminated Father's parental rights pursuant to § 2511(a)(1), (2) and (b), which provide as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
>     . . . .
>
> **(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the

- 8 -

developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2) and (b).

With respect to § 2511(a)(1), this Court has explained,

A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least the six months prior to the filing of the termination petition. The court should consider the entire background of the case and not simply:

. . . mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his . . . parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re A.S.*, 11 A.3d 473, 482 (Pa. Super. 2010) (citations omitted).

As it relates to the effect of Father's incarceration on the analysis under § 2511(a)(1), our Supreme Court reaffirmed in *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012), that the primary focus of the § 2511(a)(1) analysis is whether an incarcerated parent exercised reasonable firmness in declining to yield to obstacles created by imprisonment and employed available resources to maintain a relationship with the child. *Id*. at 828.

- 9 -

Next, we outline the legal principles pertinent to § 2511(a)(2). In *In re Geiger*, 331 A.2d 172 (Pa. 1975), our Supreme Court first announced the fundamental test in terminating parental rights pursuant to § 2511(a)(2). According to *In re Geiger*,

> three things must be shown before a natural parent's rights in a child will be terminated: (1) repeated and continued incapacity, abuse, neglect or refusal must be shown; (2) such incapacity, abuse, neglect or refusal must be shown to have caused the child to be without essential parental care, control or subsistence; and (3) it must be shown that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*Id*. at 173-174; *see also In Interest of Lilley*, 719 A.2d 327, 330 (Pa.Super. 1998).

In *In re Adoption of S.P.*, *supra*, our Supreme Court addressed the effects of incarceration upon a parent's ability to provide essential care and control pursuant to § 2511(a)(2). The High Court reasoned,

> [I]ncarceration neither compels nor precludes termination. Instead, we hold that incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.

*Id*. at 828 (quotation marks and citations omitted).

After the orphans' court finds statutory grounds to terminate parental rights pursuant to § 2511(a), it must also determine whether the involuntary termination of parental rights would best serve the child's developmental,

physical, and emotional needs and welfare pursuant to § 2511(b).  As it relates to whether the termination of parental rights would best serve L.N.B.-G.'s developmental, physical, and emotional needs and welfare pursuant to § 2511(b), we employ the following analysis.

> In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child."  In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond.  *Id*.  However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists.  *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008).  Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case.  *Id*. at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super. 2010).

After a thorough review of the *Anders* brief, the advocate briefs filed by CYS and the guardian *ad litem*, and the pertinent law, and following our independent examination of the certified record, we conclude that the appeal is frivolous and unsupported in law or in fact.  We affirm on the basis of the orphans' court's cogent and well-reasoned opinion entered on September 28, 2015.[3]  Specifically, we agree with the orphans' court's analysis as to

---

[3]  We agree with the orphans' court's proposition that Father's repeated incarceration is a legitimate factor in conducting the incapacity analysis pursuant to § 2511(a)(2).  Indeed, this principle is consistent with our Supreme Court's holding in *In re Adoption of S.P.*, *supra*.  However, the orphans' court also cited an unpublished memorandum of this Court as
*(Footnote Continued Next Page)*

§ 2511(a)(2) and (b). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*) ("we need only agree with [the court's] decision as to any one subsection in order to affirm the termination of parental rights").

Decree affirmed. Petition of Jeremy S. Montgomery to withdraw from representation is granted.

Judgment Entered.

*[signature]*

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/16/2016

---

*(Footnote Continued)*

additional support for the foregoing proposition. We observe that the reference to an unpublished memorandum is improper herein, and we emphasis that our reliance upon the orphans' court opinion should not be viewed as an *imprimatur*. ***See*** Superior Court I.O.P. 65.37 ("An unpublished memorandum decision shall not be relied upon or cited by a Court or a party in any other action or proceeding, except that such a memorandum decision may be relied upon or cited (1) when it is relevant under the doctrine of law of the case, *res judicata*, or collateral estoppel[.]").

IN THE COURT OF COMMON PLEAS OF LANCASTER COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

IN RE:                      :

       I███████ B█████-G██████,      :       No. 2014- 2115

               a minor        :

                      :

INVOLUNTARY TERMINATION     :

## OPINION SUR APPEAL

On October 15, 2014, the Lancaster County Children and Youth Social Services Agency (hereinafter "Agency") filed a petition to terminate the parental rights of the birth parents, S████ N████ B████ (hereinafter "Mother") and L███ S█████-G████, of L█████ B█████-G████ (hereinafter "LBG"). The Agency asserts in its termination petition that the parental rights of both Mother and Father should be terminated pursuant to 23 Pa. C.S.A. Section 2511 (a)(1), (a)(2), (a)(5), and (a)(8). Notice in accordance with the provisions of the Adoption Act was provided to Mother and Father. The petition was served on Mother on October 21, 2014. The petition was served on Father on October 31, 2014. Hearings were held on November 18, 2014, June 2, 2015, and July 28, 2015. This Court issued a Decree on July 2, 2015, terminating Mother's rights. On July 28, 2015, the Court issued a Decree terminating Father's parental rights.

Father filed a timely Notice of Appeal on August 28, 2015, and asserts three issues in his 1925(b) statement. First, Father claims the Court erred in finding that the Agency had met its burden by clear and convincing evidence that Father showed a settled purpose of relinquishing his parental claims and has failed to perform his parental duties for a period of six months under Section 2511(a)(1). Next, Father claims the Court erred in finding that the Agency proved by clear and convincing evidence that there is repeated and continued incapacity, abuse, neglect that has caused the child to be without essential parental care control, or subsistence necessary for the child's physical and mental well-being and the conditions causing such cannot or will not be

remedied under Section 2511(a)(2). Finally, Father claims that the Agency failed to establish under Section 2511(b) that terminating Father's parental rights was in the best interest of the child.

LBG is a biracial minor female child, born August 13, 2009, in York County, Pennsylvania. She currently resides in a pre-adoptive Resource Home with her half-sibling.

The birth mother of LBG, S███ B███, was born March 28, 1990. Her last known address is 3327 Main Street, Lot 10, Conestoga, Pennsylvania 17516. Mother was not present at the hearings. Her parental rights were previously terminated on June 2, 2015.

The birth father of LBG, L██y S█████-G████ (hereinafter "Father"), was born September 12, 1979. He is currently incarcerated at the State Correctional Institution Coal Township, Pennsylvania. He participated and testified via telephone at the hearings and was represented by counsel.

LBG is doing well in her current resource home, which is a permanent resource for her. She is placed with her half-sibling, M█████. She has voiced her desire to remain with her sister in this home. She currently receives therapy and other services to make sure her best interests and mental health needs are being met. She receives child prep services, which aids children in understanding the termination of parental rights and adoption process.

At the hearing on termination of Father's parental rights on June 28, 2015, the Court heard testimony from the Agency and from Father.[1] Mother was not present because her rights were previously terminated. The Juvenile Court records and business testimony were incorporated into that proceeding.

---

[1] Dr. Suzanne Ail conducted bonding assessments and testified at the June 2, 2015, hearing. At that time, Father was still incarcerated and had indicated his willingness to sign consents for adoption, so Father was not involved in the bonding assessment and not included in Dr. Ail's report.

The termination of parental rights is governed by statute. In re Child N., 452 Pa. Super. 230, 681 A.2d 793 (1996). The pertinent part of the statute 23 Pa. C.S.A. §2511 provides as follows:

**(a) GENERAL RULE.** – The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1)     The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2)     The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

...

(5)     The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

...

(8)     The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

**(b) OTHER CONSIDERATIONS.** – The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving notice of the filing of the petition.

3

The party seeking termination has the burden of establishing clear and convincing evidence that parents have failed to perform their parental duties. In re C.M.S., 832 A.2d 457 (Pa. Super. 2003). Clear and convincing evidence exists when testimony given is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." In re J.L.C. & J.R.C., 837 A.2d 1247, 1251 (Pa. Super. 2003). In termination proceedings, the Court must focus on the conduct of the parent and determine if that conduct justifies a termination of parental rights. In re B., N.M., 856 A.2d 847, 854-855 (Pa. Super. 2004), *citations omitted*. In order to protect his parental rights, a parent must do more than merely state he does not wish to have his parental rights terminated. In re C.M.S., 832 A.2d 457, 464 (Pa. Super. 2003), *citing* In re E.S.M., 622 A.2d 388, 395 (Pa. Super. 1993).

The Court found the Agency met its burden with regard to Father under Sections (a)(1), (2), and (8). While the Court finds clear and convincing evidence existed to support termination under all three subsections, Pennsylvania case law is clear that the Court need only find requisite evidence of one of the alleged subsection grounds to terminated parental rights. On the record, the Court gave its detailed reasoning under Section 2511(a)(8) and briefly addressed Sections (a)(1) and (a)(2), all of which were requested in the Agency's petition for termination. While the Court is steadfast that the statutory requirements of Section 2511(a)(8) were established by the Agency and supported by the record, Section 2511(a)(8) was omitted from the final written Decree entered by the Court. The Court will therefore only address the challenges to the termination of Father's parental rights under Sections 2511(a)(1) and (a)(2) as set forth in its July 28, 2015, Final Decree.

Father asserts that the Court erred by terminating Father's rights under 23 Pa. C.S. §2511(a)(1) and (a)(2), claiming that the evidence does not support termination of Father's

4

parental rights. He contends for both issues that in the period of six months prior to the filing of the termination petition, he completed a domestic abuse treatment program, completed parenting classes, participated in mental health treatment, participated in drug and alcohol treatment, had adequate and stable income through social security disability, had adequate and stable housing, and maintained a commitment to his child through letters and cards. His claims are not supported by the record.

Father and Mother were living as an intact family in August of 2009 when LBG was born. In early 2010, Father was incarcerated for ten months for violating his parole from his prior incarceration in 2007 for drug use and possession of drug paraphernalia. Father was subsequently released from prison. Between March and August of 2012, the police were called to the family's residence on six occasions for domestic incidents, to which the children were present. The Agency's first referral for this family was received on April 24, 2012, concerning domestic violence between Father and Mother. It was reported that Father bit and attempted to strangle Mother. Mother stabbed Father in self-defense. Father was charged with stalking, possession of drug paraphernalia, and three counts of simple assault. The event was a violation of the conditions of Father's bail and he was incarcerated.

On August 3, 2012, the Southern Regional Police Department responded to an altercation between Mother and maternal grandmother. Based on regularity of responses to domestic incidents at this residence, the police did not feel that the children were safe and took them into protective custody. They were then placed in the temporary physical custody of the Agency. At the Shelter Care hearing on August 7, 2012, the Court granted the Agency temporary legal and physical custody of the children. On September 4, 2012, the Court found the LBG to be a dependent child and approved a child permanency plan (CPP) with goals for reunification for

5

Mother. Father was still incarcerated and was not provided a plan pending release from prison and an assessment.

Father was released from prison on November 8, 2012. He cooperated with an assessment with the Agency Caseworker on November 28, 2012. The Agency then requested a CPP for father with the following of objectives to be approved by the Court: to improve mental health, to remain crime free, to remain free from domestic violence, to learn to use good parenting skills, to be financially stable, to obtain and maintain appropriate housing, and to maintain an ongoing commitment to child. Father requested visits with LBG and the visits were scheduled biweekly for one hour, with the first visit occurring on December 20, 2012. Father and Child had a good visit, however, over the next year Father continued to violate his parole conditions and was in and out of prison.

The five month Petition for Permanency Review and the subsequent hearing was held on January 4, 2013. Father's progress over the first five months was noted as minimal. He had been released from prison and had participated in an Agency assessment. The amended CPP was developed based on the assessment, and Father indicated his agreement with the goals and expressed an interest in diligently working on the plan. A second scheduled visit occurred on January 24, 2013, and similar to the first visit, went well.

On February 6, 2013, a Bench Warrant was issued for Father for a probation/parole violation. Prior to incarceration, Father was not complying with the requirements of his probation. Father overdosed on heroin on February 8, 2013. That same day, he was charged with use and possession of drug paraphernalia and was incarcerated. Father was released on May 3, 2013. His third scheduled visit with LBG occurred on May 13, 2013. Again, the visit went well. Ten days later, Father was again incarcerated on a parole violation.

At the ten month Petition for Permanency Review and the subsequent hearing held on June 28, 2013, the record still reflected minimal compliance and progress for Father, in that Father was incarcerated at the time of the hearing. The Agency submit an amended CPP adding a drug and alcohol objective to Father's plan. The Court approved the addition to Father's CPP. Between his first and second incarcerations during the five month period, Father completed intakes for mental health and drug and alcohol. It was noted that when Father was not incarcerated, he maintained contact with the Agency and, as previously indicated, did visit with LBG.

Father was again released from prison on August 13, 2013. He then entered a residential inpatient program at Nuestra Clinica for drug and alcohol treatment. The program also addressed Father's mental health goal and provided medication management. Father was authorized to remain in the program through October 2013. His fourth scheduled visit with LBG occurred on September 4, 2013. Father was once more incarcerated on September 18, 2013, due to a physical altercation with another resident at Nuestra Clinica. He was then unsuccessfully discharged from the program. His current incarceration is based upon this incident.

At the 17 month permanency review hearing held on January 7, 2014, Father was still in jail. He had not made any progress on his CPP, and his compliance was noted as minimal. He continued to send letters and cards to LBG from prison. It was noted that Mother was nearing the completion of her plan. At the 23 month review held on May 27, 2014, Father was still incarcerated. He had minimal compliance but continued to write LBG at least once a month. He had still not made any progress toward alleviated the circumstances which necessitated the original placement. The Agency continued to defer filing of a Petition for the Termination of Parental rights because Mother had substantially completed her plan.

In October 2014, Mother tested positive for oxycodone, a controlled substance for which she did not have a prescription. After that, her cooperation and continued progress severely diminished. The transition of LBG back into Mother's home halted. The termination petition was filed October 14, 2014. Father was served with the petition on October 31, 2014. As of that date, LBG was 26 months into her placement and all of Father's goals remained incomplete or ongoing. The initial termination hearing was held on November 18, 2014. The Court ordered bonding assessments and no testimony was taken. At the 27 month review immediately following that hearing, it was noted that Father had made no progress and was minimally compliant with the CPP.

The termination proceedings resumed on June 2, 2015. The Court bifurcated the matter. Father's portion of the termination hearing was continued to July 28, 2015, on the premise that Father intended to sign the consent to adoption. *See* N.T. 6/2/15, 3 lines 2-20. The hearing proceeded and Mother's parental rights were terminated. Father's hearing was held on July 28, 2015.

To support a finding for termination under Section (a)(1), there has to be clear and convincing evidence of a settled purpose of relinquishing parental claim to a child or that the parent has refused or failed to perform parental duties for a period of six months.

Parental duty has been defined as follows:

> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to needs of a child. A child needs love, protection, guidance and support. These needs, physical and emotional, cannot be met by a merely passive interest in development of the child. Thus, this court has held that the parental obligation is a positive duty, which requires affirmative performance.

> This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

8

> Because a child needs more than a benefactor, parental duty requires that a
> parent 'exert himself to maintain a place of importance in the child's life.

In re C.M.S., 832 A.2d 457, 462 (Pa. Super. 2003), *citing* In re Burns, 379 A.2d 535 (Pa. Super. 1997). A parent must take affirmative steps to maintain a relationship with his or her child to the best of his or her ability under the circumstances as they exist. In re D.J.S., 737 A.2d 283, 287 (Pa. Super. 1999). "A parent is required to exert a sincere and genuine effort to maintain a parent-child relationship; the parent must use all available resources to preserve the parental relationship and must exercise 'reasonable firmness' in resisting obstacles placed in the path of maintaining the parent-child relationship." In re C.M.S., *supra* at 462, *citing* In re Shives, 525 A.2d 801, 803 (Pa. Super. 1987).

While the fact that Father is incarcerated is not itself a ground for terminating his parental rights, an affirmative parental duty applies even if a parent is incarcerated. In re B., N.M., 856 A.2d 847, 855 (Pa. Super. 2003). Parental rights are not preserved for waiting for a more convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs. In re C.S., 761 A.2d 1197 (Pa. Super. 2000). In re G.P-R, 851 A.2d 967 (Pa. Super. 2004). Father's inability to parent LBG is no different than refusing to perform parental duties and responsibilities. In re E.M., 620 A.2d 481 (Pa. Super. 1983).

Father is in a difficult place. He finds himself in jail, solely because of his criminal behavior. This child is not responsible for his incarceration. His inability to perform his parental duties and responsibilities and maintain a significant bond with his child is the result of his incarceration. LBG has now been in placement for over three years, and more than 50 percent of her young life. Father has been incarcerated for approximately 65 percent of her life. In the last three years, LBG has seen her Father only four times. LBG's life "simply cannot be put on hold

9

in the hope that [Father] will summon the ability to handle the responsibilities of parenting." In re Z.P., 994 A.2d 1108, 1125 (Pa. Super. 2010).

The record supports, and it is uncontested, that LBG was removed from Mother's care by the Court while Father was incarcerated, and that Father has been incarcerated over 32 months since LBG was initially placed into the Agency's care. Father failed to perform his parental duties during that time period, due to his incarceration and recidivism.

While Father made some progress on his plan during his brief periods of release, he failed to consistently work on his plan. He failed to remain crime free despite the needs of his daughter. "A parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, health, safe environment." In re B., N.M. at 865. The fact that Father has been unable to fulfill his parental duties to LBG cannot be factually disputed. Father has been in and out of jail, not only during LBG's placement but also throughout her life. He has been unable to remain crime free. His recidivism has prevented him from consistently performing his parental duties and responsibilities for a period much greater than the necessary six months. Father has not demonstrated that he has the capability to keep his child safe and has been unable to successfully complete his plan for reunification. The record is clear and convincing that Father's parental rights were properly terminated under Section (a)(1).

In order to terminate parental rights under Section (a)(2) the following three elements must be met: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for [her] physical or mental well-being; and (3) the causes of the

incapacity, abuse, neglect or refusal cannot or will not be remedied." *See* <u>In the Interest of E.L.,</u> III (Pa. Super. 2015).

First, "[i]ncarceration neither compels nor precludes termination…incarceration is a factor, and indeed can be a determinative factor in a court's conclusion that ground for termination exist under §2511(a)(2), where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied. <u>In re Adoption of S.P.</u>, 47 A.2d 817, 828 (Pa. Super. 2012). The Agency provided services for this family for over three years aimed to reunify LBG with Mother and Father. During this time period, Father was repeatedly in and out of prison and failed to complete his CPP. "The fact that Father has made poor choices in life, which have resulted in his repeated incarcerations, is a legitimate, determinative factor in the court's decision to terminate his parental rights under section 2511(a)(2). <u>In the Interest of K.A.P., Jr.</u>, PICS Case No. 15-1055 (Pa. Super. July 2, 2015).

Second, the record, as recounted earlier in this opinion, provides clear and convincing evidence that the conditions which led to placement in 2012 continue to exist. The ongoing issues were and continue to be rooted in Father's incarceration over the past three years. Whether or not Father agrees with the reasons the child was initially placed is not relevant. LBG was found to be dependent and was placed into the legal and physical custody of the Agency on September 4, 2012. Father was in jail and unable to even be considered as a resource for this child. Neither parent filed an appeal to the adjudication of dependency.

LBG turned six years old on August 13, 2015. The Agency has been involved with this family since 2012. With the exception of the first few years of LBG's life, the Agency and this Court have been involved with the family, providing and overseeing services in an attempt to

11

keep this family intact and LBG safe. While Mother made progress, she was unable to maintain it. Father was released from prison on three occasions during this child's placement. He was unable to maintain any stability in his own life and put his child's needs first.

Clear and convincing evidence has, therefore, been presented in the record that Father's continued incapacity and neglect in parenting LBG since September 4, 2012, has resulted in the child being without essential care, control or subsistence which are necessary for LBG's physical, mental and emotional wellbeing. The remaining issues for the Court to address under (a)(2) is whether the conditions which led to placement cannot or will not be remedied by Father and whether termination is in the best interest of the child.

There is no question that Father loves his daughter. He does write to her and has stayed in contact with the Agency. However, Father has never been able to consistently be a significant part of LBG's life as a parent or work on his plan for reunification because of his frequent recidivism. His goals all remain incomplete or ongoing.[2] While Father did sporadically work on some of his goals, he was unable to start some objectives, maintain any progress he had accomplished, nor finish any goals because of his repeated incarceration.[3] The conditions which

---

[2] Father's testimony that he completed portions of his plan while in prison, is self-serving. He provided the Agency with none of this information throughout the proceedings. In fact, other than Father's testimony, no evidence that Father participated in these programs or completed these programs has been offered. His continued claim that he receives disability has been an ongoing note in his plan. While Father would not collect this aid while in prison, during his periods of release, he still failed to provide the Agency with any documentation. Therefore, the Agency's requests for documentation from Father have all gone unfulfilled.

[3] Mental Health: Father entered a residential inpatient program for drugs and alcohol treatment. The program also addressed Father's mental health and provided medication management. Father was unsuccessfully discharged from the program upon incarceration on September 18, 2013. Father has had no mental health treatment since that time.

Crime Free: One of his goals was to remain crime free. During the course of the 36 months the child has been in care, Father has been incarcerated for 32 of those months, nearly ninety percent of the time. Father was incarcerated at the time of placement. He was released on November 8, 2012. He was again incarcerated at Lancaster County Prison (LCP) from February 8, 2013, to May 3, 2013. On May 23, 2014, Father was again incarcerated until August 23, 2013. He was again incarnated on September 18, 2013, the sentence for which he is still currently incarcerated.

Father has not worked on his domestic violence goal at any point during LBG's placement. He was not referred to

led to the removal and placement continue to exist, Father is still in jail. If he were to be released in the near future, even though there does not appear to be any specific, credible evidence that he will be released soon, LBG would need to remain in Agency care for the foreseeable future while Father attempted to completed his goals.

At the time of the hearing, LBG had been in the Agency's care approaching 36 months. That is an inordinate amount of time for any child to be in care. Part of the reason for deferring termination was Mother had substantially completed her plan. Father, meanwhile, was incarcerated. During his child's placement, Father was released from prison on three separate occasions. He had opportunities to work on his CPP and maintain a place of importance in his daughter's life. Instead, he wasted those opportunities, continued to violate the law, resulting in incarceration which removed him from his daughter's life.

The "fact of incarceration alone does not obviate the duty to exercise reasonable firmness under the circumstances to maintain a secure parent/child bond." In Interest of A.P., 692 A.2d 240, 245 (Pa. Super. 1997). Father's continual confinement has essentially negated any bond he had with child during the minority of Child's life when he was not in prison. *Id.* at 9. "No

---

any programs due to his numerous and continuing incarcerations. Father has a history of drug use. He overdosed on heroin just one day after missing a scheduled visit with LBG on February 7, 2013, and was incarcerated on drug charges. Upon Father's discharge on August 23, 2013, he entered a residential inpatient drug and alcohol treatment program through Nuestra Clinica. He was unsuccessfully discharged on September 18, 2013. Father has not reported any drug and alcohol counseling since that date.

The Agency was unable to provide Father with referrals for parenting skills because Father had not completed his mental health and drug & alcohol goals. Father has not provided support for his child since he is incarcerated and unable to pay. Further, he has reported to the Agency that he receives social security disability income, but never provided the Agency with any document of that financial income over the last three years. Father is still currently incarcerated. Upon release, Father indicated he would live in the home of his sister, paternal aunt, Milagros Ramos. The Agency had recently looked into the home as possible kinship resource home. The preliminary home study found the home appropriate.

Father was granted biweekly visitation upon release from prison. His visitation rights continued until November 18, 2014. After 27 months of being afforded visitation rights, the Court suspended Father's visitation in conjunction with the TPR proceedings. During this 27 month period, father exercised this right only four times due to his frequent incarcerations. Father does stay in contact with the Agency and LBG through letters and drawings. He sends approximately two letters a month. The letters are for the most part appropriate.

13

parent-child bond worth preserving where child has been in foster care for most of child's life and resulting bond with parent is attenuated." *See* In re K.Z.S., 946 A.2d 753, 764 (Pa. Super. 2008). The situations that existed, Father's incapacity and instability, continue to exist. Mother's rights have already been terminated. This child is no closer to returning home than when she was originally placed. Father has had plenty of opportunity to remedy the conditions that caused placement. He has failed to complete his plan in a reasonable amount of time. At some point, there must finality. The record is clear and convincing that Father's parental rights should also be terminated under Section (a)(2).

The final statutory consideration under Section 2511(b) requires the Court to determine whether or not the termination of parental rights would best serve the needs and welfare of this Child, and be in the Child's best interest. Father asserts that the Court erred in its analysis, claiming that Father had provided care for his child from the child's birth in June 2008 until Father was incarcerated in April 2012, except for a period of 10 months when Father was incarcerated, and that Father visited with the child when he was not incarcerated.[4] The Court has briefly touched upon the best interest standard earlier in this Opinion. The remainder of this Opinion will continue with that analysis.

Under Section 2511(b), the Court must consider whether or not termination of parental rights is in the best interest of the child. It is not a mere formality flowing from the existence of the other required statutory elements; rather, it is a discrete consideration. In re Involuntary Termination of C.W.S.M., 839 A.2d 410 (Pa. Super. 2003). Section 2511(b) centers judicial inquiry upon the welfare of the child rather than the fault of the parent. In re A.R., 837 A.2d 560 (Pa. Super. 2003). In making this determination, the Court must carefully consider the tangible

---

[4] This reference to the child's birth date, pulled from the statement of errors, is incorrect. The child's date of birth is August 13, 2009. Her half-sister, however, was born in June of 2008.

14

dimension as well as the intangible dimension – the love, comfort, security and stability – entailed in a parent-child relationship. In re T.B.B., 835 A.2d 387 (Pa. Super. 2003). Continuity of relationship is also important to a child. In the Interest of C.S., *supra.*

The bond between a child and a parent is a proper matter to be evaluated in a termination of parental rights case. In re S.M.B., 856 A.2d 1235 (Pa. Super. 2004). Considering what situation would best serve the child's needs and welfare, the court must examine the status of the bond between the natural parent and the child to consider whether terminating the parent's rights would destroy an existing, necessary and beneficial relationship. In re Adoption of T.B.B., *supra.* A child has the right to proper parenting and fulfillment of her potential in a permanent, healthy, and safe environment. In re J.A.S., 820 A.2d 774, 782 (Pa. Super. 2003).

Termination of parental rights in furtherance of adoption is in this child's best interest. She is currently living in a pre-adoptive, stable, permanent home. LBG sees the resource family as her family, referring to them as Mom, Dad, and brother. Further, it would be detrimental to the child's well-being to be separated from her half-sister, who is also placed in this resource home. Prolonging LBG in foster care and not allowing her stability and permanency in her life would cause greater harm than termination of parental rights.

LBG's therapist, Stacey Martinez, has been working with LBG since February 2013. She has been seeing LBG weekly since that time. Ms. Martinez testified that LBG does not talk about Father often. She stated that in her professional experience, children who are attached to their parents talk about them during therapy and acknowledge not seeing those parents for a significant amount of time. Ms. Martinez testified that if LBG were attached to Father, she would discuss him. Instead, LBG refers to the resource father as "Dad." All of LBG's drawings of her family depict the resource family. Ms. Martinez noted this has not always been the case. Early

15

into her placement, Mother was joining some of the sessions. LBG would draw Mother in her pictures of her family. As this process and placement have continued, however, Mother is no longer in the drawings. More notably, Father was never in any of the pictures, including the early drawings.

Ms. Martinez further testified in her expert opinion that LBG had no attachment to her biological Father and therefore, it would cause no harm or detriment to her if Father's rights were terminated. Conversely, LBG does discuss her resource family. LBG considers them to be her permanent home and shows great attachment and bonding to the resource family. She testified that it was in LBG's best interest, mental health, and emotional wellbeing that Father's parental rights be terminated.

Julianna Brim, the Court Appointed Special Advocate (CASA) for LBG and her half-sister, also testified to LBG's attachment with the resource family. The resource family provides LBG not only with boundaries and discipline but also with love and affection. The girls have come to trust that this will be their permanent home. Ms. Brim testified that when she was first assigned to these children, they were afraid that if they were bad, they would have to leave the resource family. Even being put in time-out concerned them, worried they would be sent back home. She further testified that they no longer question the permanence of this home. The question has now become, "When can we change our name?" N.T. 7/28/15, 26-28.

Additionally, Ms. Martinez expressed great concern should LBG be separated from her half-sister, because they have endured the entirety of placement together. She testified that it would cause great damage to LBG to be taken away from her sister, because of their significant bond. To remove LBG from her current resource home would cause great harm. Emotionally, it would tear her apart. "She would be taken away from her sister and her sister got to stay there.

That is a huge concern with siblings being split up. I believe she could also be upset at the resource family, thinking it was their fault or she did something wrong...this is the only home she remembers at this point." N.T. 6/2/15, 14-17; N.T. 7/28/15, 15-25.

Father desires to have LBG removed from her home of the last three years and placed with a Paternal Aunt until he is released, and then he'll work toward completing his plan and reunification. Ms. Martinez testified that LBG has never mentioned her Paternal Aunt.

Ms. Brim opined that she is against moving LBG to kinship care, saying she was not aware there was an aunt in the picture because of lack of contact throughout the entire time she has been in care. "If LBG was not to reside with her resource family and her sister, I think she would believe that she was bad, and that's why she wasn't allowed to stay there." N.T. 7/28/15, 26-28. She further voiced concern over separating the girls: "I am not in agreement with separating the girls. I do believe they need to remain together. It goes as far as they share, simply, a bedroom together, and all of a sudden you are going to have a child sleep alone." *Id.*

The Court is persuaded by the testimony of LBG's therapist and the CASA who believe that it would be harmful to remove this child from her resource home and her sister and that it would not be harmful to sever the ties between this child and her Father. It would be detrimental to allow this child to linger in foster care waiting to see if Father will get out of prison, not repeat his pattern of recidivism, and finish his plan. LBG considers the resource family her family. It is the family that she remembers. It is significant that LBG has been in this home for the entire time of her placement. The Court does not doubt that Father feels a bond was created through the first two and half years of LBG's life, but her life continued after Father was incarcerated. The record does not indicate the existence of any meaningful bond with her Father. However, LBG is bonded to her resource family.

17

LBG needs permanence. She needs stability. She needs love. She is getting all of that in her resource home. She is finally in an intact family with a mother, father, brother, and biological sister. To remove her from that would be harmful. This child is in a safe, stable environment. One that meets all of her developmental and emotional needs. Her resource home is a safe, permanent place for her. The evidence is clear and convincing that it is in the best interest of this child, based upon the testimony and the record, that the Agency's request be granted and that Father's rights should be terminated so that this child can remain in her resource home, and eventually be adopted by this family that has and will continue to meet all of her needs.

The Court's decision that the Agency has established by clear and convincing evidence that the parental rights of Father should be terminated pursuant to Sections 2511(a)(1), (a)(2), (a)(8) and Section (b) of the Adoption Act is suggested by the record. All issues raised by Father in his 1925(b) statement have been fully addressed. The Court's determination that the Agency met its burden and the Order terminating Father's parental rights should be affirmed. The Clerk of the Orphans' Court is directed to transmit the record to the Superior Court.

BY THE COURT:

Date: September 28, 2015

JAY J. HOBERG, JUDGE

ATTEST: 

(DEPUTY CLERK - OCD

Copies to:
Jeremy Montgomery, Esquire – Attorney for Appellant (2)
Jacquelyn E. Pfursich, Esquire – Attorney for Agency

Pamela J. Breneman, Esquire – Guardian ad Litem
Children and Youth (2)