J-A06006-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF G.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: FAYETTE COUNTY CHILDREN AND YOUTH SERVICES | : | |
| | : | |
| | : | No. 936 WDA 2023 |

Appeal from the Decree Entered August 2, 2023
In the Court of Common Pleas of Fayette County Orphans' Court at
No(s): 27 ADOPT 2022

| | | |
|---|---|---|
| IN RE: ADOPTION OF T.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: FAYETTE COUNTY CHILDREN AND YOUTH SERVICES | : | |
| | : | |
| | : | No. 937 WDA 2023 |

Appeal from the Decree Entered August 2, 2023
In the Court of Common Pleas of Fayette County Orphans' Court at
No(s): 28 ADOPT 2022

BEFORE: LAZARUS, P.J., PANELLA, P.J.E., and BECK, J.

DISSENTING MEMORANDUM BY BECK, J.:     **FILED: May 6, 2024**

I respectfully dissent. Based upon the orphans' court's own factual findings—all of which are supported by evidence in the certified record transmitted to this Court on appeal—it is apparent that, as a matter of law, the conditions which led to the removal of G.W. and T.W. ("Children") from the care of C.W. ("Mother") continued to exist at the time CYS filed the petition to terminate Mother's parental rights (fourteen months after Children's

removal from her care) and at the time of the hearing on the petition (twenty-four months after removal). Even accounting for our limited standard of review and deference to the orphans' court in termination of parental rights cases, my review of the orphans' court's opinion makes clear that it conflated the legal analysis required for a finding of termination pursuant to 23 Pa.C.S. § 2511(a)(8) with that for the other subsections of section 2511(a), thereby applying the wrong law to its own factual findings and resulting in an erroneous decision. Furthermore, the orphans' court used an incorrect legal framework to evaluate whether CYS's evidence proved that termination best served Children's needs and welfare under sections 2511(a)(8).

The learned Majority does not account for these legal errors in its decision and determines instead that the record on appeal is incomplete, hindering our appellate review to such an extent that this Court is constrained to affirm. While I agree that the certified record has its flaws, if the proper legal analysis is applied, the deficiencies in the record do not prevent this Court from conducting appellate review. Upon conducting such a review, I would vacate the orders denying the petitions to terminate Mother's parental rights and remand this case to the orphans' court for prompt proceedings consistent with this dissent.

Section 2511(a) "provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination." *In re Adoption of C.M.*, 255 A.3d 343, 359 (Pa. 2021); *see* 23 Pa.C.S. § 2511(a)(1)-(11). Each subsection is distinct. The petitioner only needs to

prove one of the grounds alleged under subsection (a) in order to shift the focus to section 2511(b), which requires the court to determine whether termination serves the children's developmental, physical, and emotional needs and welfare. ***In re K.R.***, 200 A.3d 969, 979 (Pa. Super. 2018) (en banc).

In the case at bar, Fayette County Children and Youth Services ("CYS") sought to terminate Mother's parental rights under subsections (a)(1), (a)(2), (a)(5), and (a)(8). The orphans' court determined that CYS did not prove, by clear and convincing evidence, any of these statutory grounds to terminate Mother's parental rights. In my view, the orphans' court erred in its legal analysis conducted under section 2511(a)(8).

The relevant portions of the Adoption Act provide as follows:

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, **the conditions which led to the removal or placement of the child continue to exist** and termination of parental rights would best serve the needs and welfare of the child.

* * *

(b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of

- 3 -

environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8), (b) (emphasis added).

CYS argues that it presented sufficient clear and convincing evidence proving that Mother's continuous difficulties with mental health, substance abuse, housing, and the criminal justice system have prevented her from reunifying with Children. *See* CYS's Brief at 14-19. It asserts that, despite the orphans' court's ultimate conclusion, the court's own factual findings demonstrate that CYS met its burden. *See id.* at 16. From CYS's perspective, the orphans' court erroneously focused upon Mother's love for her children instead of the evidence demonstrating that Mother has unresolved issues that have prevented reunification.

In reviewing an agency's challenge to the denial of its petition to terminate a parent's rights, particularly in a case that may have presented a close judgment call for the orphans' court, we abide by our Supreme Court's specific instructions and words of caution:

Termination of parental rights is among the most powerful legal remedies that the judicial system possesses. The decision to sever permanently a parent's relationship with a child is often bound up in complex factual scenarios involving difficult family dynamics and multiple service providers. Our trial courts are tasked with carefully considering and weighing all of the evidence presented at termination hearings in determining whether the petitioning party has met its burden of proving by clear and

convincing evidence that termination meets the exacting standards outlined in the Adoption Act.

Because trial courts are on the front lines assessing the credibility of witnesses and weighing competing and often challenging evidence, it is paramount that, in reviewing trial courts' decisions in this arena, appellate courts defer to trial courts' first-hand observations as they relate to factual determinations. In this regard, we reiterate that appellate courts must review such decisions for an abuse of discretion or error of law, and **appellate courts may reverse trial courts only when that discretion has been breached or when the law has been misapplied**. In other words, an appellate court should review the certified record to decide whether it supports the trial court's order, regardless of whether the appellate court agrees with the result that the trial court reached.

*Interest of S.K.L.R.*, 256 A.3d 1108, 1129 (Pa. 2021) (emphasis added);

*see also In re Adoption of L.A.K.*, 265 A.3d 580, 597 (Pa. 2021) ("This Court has repeatedly stated that in termination cases involving close calls, deference to the trial court's determination is particularly crucial."). Stated another way, our job is to "review the record for an abuse of discretion and for whether evidence supports that trial court's conclusions;" we may not "search the record for contrary conclusions or substitute [our] judgment for that of the trial court." *S.K.L.R.*, 256 A.3d at 1124.

With that standard in mind, I first examine whether the orphans' court's factual findings are supported by the record. According to the orphans' court, the conditions leading to Children's removal from Mother's care were Mother's arrest and concerns about Mother's mental health and drug and alcohol use. Orphans' Court Opinion ("Opinion"), 8/4/2023, at 10; *see also id.* at 1-2 (Findings of Fact ("F.F.") ¶¶ 7, 10).

The record reflects that G.W. (age eight at the time of the hearing) and T.W. (age four at the time of the hearing), are the ninth and tenth of Mother's children. Mother has not raised Children's eight older siblings. Six were adopted and two were raised by a relative. Notes of Testimony ("N.T."), 5/11-12/2023, at 179. A month prior to Children's removal, Westmoreland County Children's Bureau ("WCCB") received a report alleging that Mother was using methamphetamine. CYS Exhibit 3 (Dependency Adjudication Order). Mother initially refused to cooperate with WCCB's investigation by submitting urine screens. *Id.*

On May 14, 2021, Mother was arrested after she attempted to break into a house while under the influence and accompanied by Children, who were then ages six and two. N.T., 5/11-12/2023, at 13-14. As a result, the Court of Common Pleas of Westmoreland County ("juvenile court") removed Children from Mother's care and placed them in WCCB's legal custody. Opinion, 8/4/2023, at 1 (F.F. ¶ 7). Children have been in the same foster home since three days after their initial removal. *Id.* (F.F. ¶ 9).

Following her arrest, Mother was incarcerated and her conditions of bond prohibited contact with Children. WCCB filed a petition to adjudicate Children dependent under the Juvenile Act, 42 Pa.C.S. §§ 6301–6375. The agency had concerns about Mother's mental health based upon Mother's "erratic behavior." CYS Exhibit 3 (Dependency Adjudication Order). Additionally, Mother tested positive for benzodiazepines on an agency drug

screen, and Mother was "impaired" during the incident that led to Children's removal, which was especially concerning because Mother had a lengthy history of substance abuse. *Id.* In fact, CYS had previously placed Children with their paternal grandmother for a month in October 2020, because of Mother's and G.W.'s father's impairment from drugs and alcohol. *Id.* The juvenile court in Westmoreland County adjudicated Children dependent on July 9, 2021.

Mother was released from incarceration in or around late July 2021. Opinion, 8/4/2023, at 2 (F.F. ¶ 11); N.T., 5/11-12/2023, at 13-14. Shortly thereafter, she "report[ed] for a mental health evaluation in August 2021, and she attended [four] out of [five] sessions." Opinion, 8/4/2023, at 2 (F.F. ¶ 14); N.T., 5/11-12/2023, at 17. Around the same time, Mother called WCCB and made "nonsensical statements saying that [T.W.] was a robot," that Children's foster parents were selling T.W.'s organs, and that she wanted Children removed from the foster parents' home. Opinion, 8/4/2023, at 2 (F.F. ¶ 15); N.T., 5/11-12/2023, at 20, 31. Mother began mental health treatment in October 2021. Opinion, 8/4/2023, at 4 (F.F. ¶ 30); N.T., 5/11-12/2023, at 137. She was not cooperative with drug screens, participating in only five out of twenty-seven screens. Of those five, she tested positive for alcohol on two occasions. Opinion, 8/4/2023, at 2 (F.F. ¶ 13); N.T., 5/11-12/2023, at 16-18. Mother obtained her own housing in Fayette County and

WCCB transferred the case to CYS in December 2021. Opinion, 8/4/2023, at 2(F.F. ¶ 16); N.T., 5/11-12/2023, at 19-20.

Shortly after the case transfer, Mother tested positive for methamphetamines on December 21, 2021. Opinion, 8/4/2023, at 3 (F.F. ¶ 28); N.T., 5/11-12/2023, at 133-34. She subsequently underwent two drug and alcohol assessments, neither of which indicated that she needed treatment. However, according to the orphans' court's findings of fact, "Mother … failed to provide honest information relative to her drug and/or alcohol use," refused to sign a release to permit CYS to provide information to the evaluator, and "reported that she had been 'clean' since 2014, despite the fact that Mother tested positive for methamphetamines on [a] December 21, 2021 drug screen." Opinion, 8/4/2023, at 3-4 (F.F. ¶¶ 28, 32); N.T., 5/11-12/2023, at 134-38, 247.[1] After undergoing the updated assessments requested by CYS, Mother tested positive twice, once for TCA[2] and once for alcohol. Opinion, 8/4/2023, at 3 (F.F. ¶¶ 18-19); N.T., 5/11-12/2023, at 38. She also refused or was unavailable for screens. Opinion, 8/4/2023, at 3 (F.F. ¶ 18); N.T., 5/11-12/2023, at 38. Mother received mental health treatment

---

[1] Later, the orphans' court stated that it was "indeterminable whether Mother was completely honest during the drug and alcohol evaluations," despite entering findings of fact indicating that Mother was indeed not honest during her evaluations. **Compare** Opinion, 8/4/2023, at 9 **with id.** at 3-4 (F.F. ¶¶ 28, 32).

[2] "TCA" is not identified in the record, but possibly stands for tricyclic antidepressants.

from October 2021 until March 2022, but refused "medication management for her diagnosis of schizophrenia" and stopped going to treatment. Opinion, 8/4/2023, at 4 (F.F. ¶¶ 30-31); N.T., 5/11-12/2023, at 137, 167, 178-79, 238.

Caseworker "Jennifer Guseman testified credibly that despite Mother's negative drug screens, Mother's behaviors continued to be very 'erratic', and it was indeterminable whether Mother's behaviors resulted from impairment or mental health issues." Opinion, 8/4/2023, at 3 (F.F. ¶¶ 29); N.T., 5/11-12/2023, at 136. For example, at a May 17, 2022 supervised visit at her home, Mother "reeked of alcohol," "appeared to be impaired," "slurred words," and "was nodding off while playing on the floor with [C]hildren." Opinion, 8/4/2023, at 2 (F.F. ¶¶ 19); N.T., 5/11-12/2023, at 42-43. When the service provider supervising the visit and administering the drug screen told Mother that her screen was positive for TCA, "Mother became very upset and threw the cup with urine toward the caseworker." Opinion, 8/4/2023, at 2 (F.F. ¶¶ 19); N.T., 5/11-12/2023, at 42-43.

Mother was arrested and charged with harassment in connection with the urine-throwing incident in May 2022. N.T., 5/11-12/2023, at 163, 203. That same month, she was arrested again and charged with theft of an ankle monitor and escape from the ankle monitor. *Id.* at 234. Unable to make bail, she was re-incarcerated in the Fayette County Jail while awaiting trial. Opinion, 8/4/2023, at 5 (F.F. ¶ 51); N.T., 5/11-12/2023, at 234. While she

was in jail, Mother began attending Narcotics Anonymous ("NA") and Alcoholics Anonymous ("AA"), and she visited with Children via short Zoom sessions. Opinion, 8/4/2023, at 4-5 (F.F. ¶¶ 34, 35); N.T., 5/11-12/2023, at 213, 236.

Meanwhile, on July 15, 2022, which was sixteen months after Children entered foster care, CYS filed the petition to terminate Mother's parental rights.

Ultimately, Mother was convicted of harassment in the urine-throwing case. According to Mother, two weeks before the termination hearings, she was sentenced to ninety-eight days in prison, which was ordered to run consecutive to her criminal trespass sentence stemming from the incident that brought Children into care. N.T., 5/11-12/2023, at 233.

Mother remained incarcerated at the Fayette County Jail at the time of the May 2023 hearings on CYS's petitions. Her release date was uncertain, as she still had to transfer to a state correctional institute to complete her sentences in the criminal trespass and harassment cases.[3] *Id.* at 234. Because she had been incarcerated waiting for trial in the ankle monitor case for almost a year, Mother anticipated a filing by her lawyer asserting her

---

[3] According to Mother, her minimum release date for the trespass conviction had passed in February 2023, and her maximum release date was a year away. N.T., 5/11-12/2023, at 243. Mother had filed a petition for post-conviction relief on the trespass conviction that was still pending before the trial court judge. *Id.* at 235.

speedy trial rights if the Commonwealth did not bring her to trial within the following month. *Id.* Nonetheless, at the time of the termination hearing, these criminal charges also remained pending, preventing her from serving her sentences in her other two cases and from working on her maintenance of sobriety outside of jail or prison.

As indicated by the above citations, my review of the record reveals that the orphans' court's findings of fact are supported by the evidence included in the certified record before this Court on appeal. Because the factual findings supported by the record, I now turn to a determination of whether the orphans' court's legal conclusions are "the result of an error of law or an abuse of discretion." *In re Adoption of S.P.*, 47 A.3d 817, 827 (Pa. 2012).

In finding that CYS failed to meet its burden of proving termination under section 2511(a)(8), the orphans' court offered the following analysis:

> The child has been removed from Mother, and [twelve] or more months have elapsed from the removal; however, clear and convincing evidence has not been presented that the conditions which led to the removal continue to exist and termination would best serve the needs and welfare of [Children].
>
> Mother's conduct in this case certainly has been bizarre at times and unacceptable. A few of the most blatant examples include Mother greeting caseworkers without being properly clothed and making remarks to caseworkers of a sexual nature. At one time, Mother left a disturbing voicemail to a Westmoreland County caseworker about her child being a "robot," and the foster parents were selling her organs. These incidents, although disturbing, do not appear to be the norm, and do not evidence that Mother cannot or will not remedy the conditions which caused the removal.

Mother clearly loves [Children], and this is best evidenced by Mother's consistent visitation with [Children]. Despite her incarceration, Mother has consistently visited, and she has requested additional visitation time. For the past year, Mother has been limited in her ability due to her incarceration. She has utilized the resources available to her while incarcerated, and she **demonstrates the desire to remedy the conditions which led to the removal** of [Children].

Orphans' Court Opinion, 8/4/2023, at 10-11 (emphasis added).

The orphans' court elaborated upon its analysis in its Pa.R.A.P. 1925(a) statement in lieu of opinion, indicating that its

findings of fact do include that Mother's compliance has not always been perfect with respect to the goals set for her by Fayette [County] CYS. However, the findings of fact also include that **Mother has consistently demonstrated that she wishes to maintain her parental relationship with, and to care for, her children**. The length of time a child is in foster care, in itself, is not determinative of whether a biological parent's rights should be terminated, nor is less-than-stellar compliance by that parent. Here, in fact, after permanency review hearings in October 2022, January 2023 and April 2023 hearings, [the juvenile court] consistently found that Mother was at least minimally compliant with her Family Service Plan. Further, after the January 2023 and April 2023 hearings, [the juvenile court] found that Mother was as compliant as she could be, given her incarceration. After consideration for the factors that [CYS] highlights as evidence of Mother's unsuitability *and* the factors that demonstrate Mother's dedication to maintaining her parental relationship with her children, there was not sufficient evidence to support termination of Mother's parental rights.

Orphans' Court Statement in Lieu of Opinion ("Statement"), 9/6/2023, at 2-3 (numbering supplied; italicized emphasis in original; bolded emphasis added).

In accordance with the statutory language, the correct (a)(8) analysis requires a determination of whether: (1) twelve months have elapsed since the juvenile court removed the child from the parent's care; (2) the conditions

- 12 -

that led to the removal continue to exist; and (3) terminating the parent's rights serves the child's needs and welfare. **In re C.L.G.**, 956 A.2d 999, 1008-09 (Pa. Super. 2008) (en banc). Despite the orphans' court's accurate recounting of the elements of subsection (a)(8), it is evident from the face of the opinions that it used an incorrect legal standard to evaluate CYS's petition under this subsection.

The orphans' court intermingles cases addressing a parent's incarceration under subsection (a)(1) when analyzing whether CYS met its burden to prove grounds under other subsections, including subsection (a)(8).[4] Although factual matters under the Adoption Act do not always neatly fit into legal boxes, our Supreme Court has emphasized time and again that we must hew closely to the statutory language. **See, e.g., In re K.T.**, 296 A.3d 1085, 1105 (Pa. 2023) (analyzing the "pivotal language" of the statute); **S.P.**, 47 A.3d at 827-28 (cautioning this Court to avoid "improperly quoting" caselaw applying a different subsection because the statutory grounds are distinct and cannot be conflated).

Here, the orphans' court's conclusions of law focus almost exclusively on caselaw applying subsection (a)(1). **See** Opinion, 8/4/2023, at 7

---

[4] CYS exacerbates this by presenting a very disjointed argument that intermixes allegations of error under all the subsections with a heavy emphasis upon caselaw focused upon subsection (a)(1). **See** CYS's Brief at 10-19. This does not hamper our review, however, as we review pure questions of law pursuant to a de novo standard. **Interest of K.T.**, 296 A.3d 1085, 1104 (Pa. 2023).

(Conclusions of Law, ¶¶ 2-4). In its section 2511(a)(8) analysis, it emphasized the limitations imposed by incarceration, Mother's earnestness in visiting Children over Zoom, and Mother's "utiliz[ation of] the resources available to her while incarcerated." *Id.* Further, in reaching its findings, the orphans' court appears to have operated under an assumption that it legally could not recognize Mother's incarceration as part of the conditions that continued to exist, particularly because Mother did what she could to comply with her goals from prison. However, this analysis perpetuates the error observed by our Supreme Court in *S.P.*—applying cases analyzing parental abandonment under section 2511(a)(1) to other subsections without critically engaging with the language of the statute.

Section 2511(a)(1) provides "grounds for termination if the parent 'evidenced a settled purpose of relinquishing parental claim to a child, or has refused or failed to perform parental duties' for a period of at least six months." *S.P.*, 47 A.3d at 827-28 (quoting 23 Pa.C.S. § 2511(a)(1)). In *In re McCray's Adoption*, 331 A.2d 652 (Pa. 1975), which interpreted an earlier statute akin to subsection (a)(1), our Supreme Court observed that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child," but that incarceration made "performance of this duty 'more difficult.'" *S.P.*, 47 A.3d at 828 (quoting *McCray*, 331 A.2d at 665). The *McCray* Court determined that a

parent's absence and/or failure to support [a child] due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child. Where the parent does not exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

*S.P.*, 47 A.3d at 828 (quoting *McCray*, 331 A.2d at 665).

The *S.P.* Court recognized that this Court often quoted this passage from *McCray* and its progeny to support its erroneous "assertion that incarceration alone cannot be grounds for termination under any provision of [section] 2511(a)." *S.P.*, 47 A.3d at 828. Instead, the *S.P.* Court determined that "incarceration neither compels nor precludes termination." *Id.* The Court held that "incarceration, while not a litmus test for termination, can be determinative" of the elements of section 2511(a)(2). *Id.* Although section 2511(a)(8) was inapplicable in *S.P.* for different reasons, the Court noted that a majority of Justices in *In re R.I.S.*, 36 A.3d 567 (Pa. 2011) (plurality), agreed that a parent's incarceration can be a factor in an orphans' court's decision to terminate parental rights under several of the enumerated grounds, including whether the conditions leading to removal continued to exist pursuant to subsection (a)(8). *S.P.*, 47 A.3d at 829-30, nn. 8-9.

Additionally, in the instant case, the orphans' court opined that Mother demonstrated the desire "to remedy the conditions which led to [Children's] removal," as well as her wish "to maintain her parental relationship with, and

- 15 -

to care for, her children." Statement, 9/6/2023, at 3. But unlike other subsections of the termination statute,[5] a parent's "willingness or ability to remedy the conditions" that led to the children's removal is not pertinent to the legal determination required under subsection (a)(8). *In re Adoption of R.J.S.*, 901 A.2d 502, 511 (Pa. Super. 2006); *see also In re I.J.*, 972 A.2d 5, 11 (Pa. Super. 2009) (holding that the orphans' court erred by "improperly conflat[ing] the statutory requirements of subsections (a)(2) and (a)(5) with those of subsection (a)(8)").

The orphans' court opined that Mother's "bizarre," "unacceptable," and "disturbing" behavior did not "appear to be the norm" and did "not evidence that Mother cannot or will not remedy the conditions which caused the removal." Opinion, 8/4/2023, at 10. Additionally, the orphans' court emphasized its findings in the dependency matter that Mother "was at least minimally compliant with her Family Service Plan" since October 2022 and that she "was as compliant as she could be, given her incarceration." *Id.* at

---

[5] *Compare*, *e.g.*, 23 Pa.C.S. § 2511(a)(1) (directing courts to examine the parent's conduct for evidence of intent to relinquish parental claim, or refusal or failure to perform parental duties), *and* (a)(2) (directing courts to consider whether certain parental incapacity, abuse, neglect, or refusal cannot or will not be remedied by the parent), *and* (a)(5) (directing courts to determine whether the parent cannot or will not remedy the conditions which led to the removal or placement of the child within a reasonable period of time and whether services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time), *with* (a)(8) (directing courts to decide whether the conditions that led to the placement or removal of the children continue to exist).

3. Importantly, nowhere does the orphans' court conclude that Mother **has** remedied the conditions which led to Children's removal, as the law is clear that a finding that a parent "was making progress toward remedying the conditions," is legally insufficient to preclude termination under (a)(8). **R.J.S.**, 901 A.2d at 511; **see also C.L.G.**, 956 A.2d at 1006-08 (affirming termination of parental rights under (a)(8) even though parent made "substantial progress" and was sober in prison; that the parent was incarcerated for drug offenses demonstrated that her "drug related issues continued to impact" her child and parent's "ability to care" for her child). "The relevant inquiry regarding the second prong of section 2511(a)(8) is whether the conditions that led to removal **have been remedied** and thus whether reunification of parent and child is **imminent** at the time of the hearing." **In re M.E.**, 283 A.3d 820, 832 (Pa. Super. 2022) (cleaned up; emphasis added); **see also Matter of Adoption of L.C.J.W.**, 311 A.3d 41, 51 (Pa. Super 2024) (specifying that the pertinent issue "is whether, after a full year of services, [the parent] had remedied the conditions such that she was presently able to resume care and custody of her children").

The orphans' court compounded its legal errors by arriving at a conclusion that was manifestly unreasonable when viewed in combination with its own factual findings. Applied to the proper legal framework, the orphans' court's findings demonstrate that the conditions leading to Children's removal from Mother's care continue to exist. As found by the orphans' court, Children

were placed in foster care because of Mother's arrest and incarceration, her substance abuse, and her mental health. After two years, Mother once again was unable to care for Children because of a second incarceration. Mother's only sustained period of sobriety occurred in the confined environment of prison. *See C.L.G.*, 956 A.2d at 1008. Even if the orphans' court was not convinced that Mother's mental health was a barrier to reunification, according to the court's own findings, Mother's substance abuse, which intertwined with her sustained involvement with the criminal justice system and repeated incarcerations, persisted.

By virtue of the orphans' court's own findings, this is not a situation where the children were about to be reunified and the parent's incarceration was a mere temporary setback. Mother had not even achieved unsupervised visitation prior to entering prison for a second time. Mother relapsed several times after she was released from her initial incarceration. While relapses may be expected by a person struggling with overcoming addiction, her relapses plus her second incarceration prevented her from gaining any traction towards reunification. Even assuming, arguendo, that Mother was released immediately after the hearing, she would need time to demonstrate that she could sustain her sobriety in the world. *See C.L.G.*, 956 A.2d at 1008. ("While it appears that [m]other has managed to remain drug-free in the confines of incarceration, whether she can maintain that status among the external pressures of the outside world remains to be proven.").

This Court has recognized "that the application of section 2511(a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to the removal of her children." **R.J.S.**, 901 A.2d at 513.

> However, by allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit [eighteen] months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

**Id.**

In my opinion, the intermingling of legal standards by the orphans' court has led the Majority astray in its review of this matter. The Majority determines that it is "constrained to affirm" the denial of the petition because

> the record on appeal lacks evidence to prove, clearly and convincingly, that Mother has failed to address and fulfill her mental health or drug and alcohol goals under either the [WCCB] or [CYS] service plans. Specifically, CYS has not provided this Court with sufficient documentation to satisfy its burden to terminate Mother's parental rights under subsection 2511(a).

Maj. Op. at 22. The Majority laments the absence of the following "missing documents," **see id.** at 22, some of which the Majority identifies as "critical," **see id.** at 16:

- Referrals alleging physical abuse of Children by Mother in April and June 2021 and WCCB reports deeming such allegations to be unfounded, **id.** at 3 n.7;

- "Transcript from May 18, 2021 shelter care hearing that was referenced in [WCCB's dependency petition]," *id.* at 16;

- Permanency review hearing orders from Westmoreland and Fayette Counties; *id.* at 22;

- Any mental health or drug and alcohol evaluations and recommendations regarding Mother from Westmoreland County, *id.*;

- Psychiatric evaluations performed by Dr. Franks on Mother; *id.* at 21 n.23, 22;

- "SPHS' mental health evaluation of Mother (containing schizophrenia diagnosis)," *id.*; and

- "Mother's criminal record," *id.*

I applaud and greatly respect my learned colleagues' desire to conduct a diligent review of the record in this very serious matter. As an appellate court, however, our role in this case is not to decide whether CYS satisfied its burden of proof at the hearing; instead, we must decide whether the orphans' court abused its discretion or erred as a matter of law in deciding that CYS did not. It is true that as part of such review, we must determine whether the trial court's factual findings are supported by the record. But we are not the finders of fact, and we cannot substitute our judgment for that of the orphans' court. *See S.K.L.R.*, 256 A.3d at 1123-24. Moreover, neither the orphans' court nor this Court may substitute our judgment for that of the dependency court on the same factual issue. *See Matter of Adoption of M.A.B.*, 166 A.3d 434, 446 (Pa. Super. 2017). The question we must consider is whether there was evidence of record admitted at the termination hearing to support

the orphans' court findings, **S.K.L.R.**, 256 A.3d at 1129, and not, as the Majority implicitly suggests, whether there was documentation presented at the hearing to bolster the testimony that the orphans' court found to be credible.

For example, the Majority's identification of "critical documents" includes a transcript from a May 18, 2021 shelter care hearing referenced in the WCCB's dependency petition. I disagree that the omission of this transcript impairs our review based upon its mere mention in the dependency petition. The focus of the termination proceeding "is whether CYS has satisfactorily borne its statutory burden for termination under section 2511; not to review the previous juvenile court proceedings." **In re J.A.S.**, 820 A.2d 774, 781 (Pa. Super. 2003) (cleaned up). The jurisdiction of the orphans' court to terminate parental rights "is derived from a different statute" and the purpose of the proceedings under the Juvenile Act and the Adoption Act are "wholly distinct." **Id.**

The record reflects that CYS introduced the dependency petition alongside the juvenile court's dependency adjudication order without objection in the termination matter. But a dependency petition, similar to a complaint, simply contains unproven allegations that an agency presents to the juvenile court for adjudication. In my view, it carries little evidentiary weight other than showing consistency between an agency's concerns at the time of the initial dependency hearing and the termination testimony. The adjudication order contained factual findings by the juvenile court that were consistent with

the testimony of WCCB's caseworker. ***Compare*** CYS Exhibit 3 (Adjudication Order) ***with*** N.T., 5/16-17/2023, at 12-34. Thus, we have sufficient evidence to ensure that the orphans' court's finding as to the basis for Children's removal is supported by the record.

By way of further example, the Majority observes that "CYS'[s] appellate brief and its witnesses at the termination hearing repeatedly reference" various documents external to the agency regarding Mother's mental health and drug and alcohol evaluations and treatment. Majority Opinion at 23. The Majority contends that the absence of these documents significantly hinders our appellate review. ***Id.*** Again, I disagree. This Court does not make factual findings or judge the witnesses' credibility. I recognize that the decree must be based upon competent evidence, and to the extent that CYS introduced Dr. Franks' recommendation to prove the truth of the matter asserted, it constituted hearsay. But Mother did not object to the testimony regarding statements by external service providers, and the testimony was admitted and considered by the orphans' court. ***Accord Com. ex rel. Robinson by Robinson v. Robinson***, 478 A.2d 800, 805 (Pa. 1984) (holding that this Court erred by sua sponte raising evidentiary concerns in a child custody case where "no litigant has questioned the authenticity and adequacy of the reports or complained of their admission and consideration"); ***cf. generally In re A.J.R.-H.***, 188 A.3d 1157 (Pa. 2018) (vacating decree terminating parental rights because decree was based upon en masse introduction of 167 exhibits with multiple layers of hearsay over parent's hearsay objection).

The orphans' court made findings regarding these specific matters based upon the witnesses' testimony, which, again, came in without objection. Moreover, no one disputes the content of the providers' recommendations, except for Mother's disagreement about her mental health diagnoses. *Compare* N.T., 5/11-12/2023, at 240-43 (Mother denying that SPHS, her former mental health provider, diagnosed her with schizophrenia or that she refused medication), *with id.* at 137 (CYS caseworker Jennifer Guseman testifying that Mother signed a release permitting CYS to speak to SPHS and that SPHS informed Guseman that Mother was diagnosed with schizophrenia in 2018 and refused medication management). The orphans' court resolved the factual dispute in CYS's favor, stating in its findings of fact that Mother was diagnosed with schizophrenia.[6] Opinion, 8/4/2023, at 4 (F.F. ¶ 30). As there was no objection raised by Mother before the orphans' court (nor any argument raised on appeal before this Court) concerning the absence of these reports, it is improper for this Court to sua sponte find that CYS's failure to present these reports before the orphans' court precluded a finding that it satisfied its burden of proving the standards for termination of parental rights under section 2511(a)(8).

The Majority is also concerned that the "record is nearly devoid of any information speaking to Mother's compliance level with her service plan

---

[6] The orphans' court nonetheless discounted Mother's mental health as a factor in its ultimate decision. This conclusion is of no moment as it relates to this Court's review given the continuing presence of the other conditions that led to Children's removal, as found by the orphans' court.

objectives from the date her first plan was ordered in Westmoreland County until the case was transferred to Fayette County." Majority Opinion at 23 n.27. Once again, I am constrained to disagree with my learned colleagues that this information was required to be included in the certified record before this Court. The record includes the testimony of WCCB caseworker supervisor Molly Clayton, which is competent evidence as to Mother's compliance with offered services.

Although the juvenile court orders can be helpful in establishing the elements of sections 2511(a), nothing in the Adoption Act requires introduction of the orders.[7] The Majority also states that "record evidence indicates that Mother had, or almost had, almost achieved her goals prior to the case being transferred." *Id.* at 24. But even if Mother was making progress on her goals in Westmoreland County, she did not achieve reunification during that time, she had a positive screen shortly after her move to Fayette County, and she did not sustain the progress over time. Moreover, as discussed at length above, if the conditions that led to Children's removal

_____

[7] The juvenile court is required by statute to assess both compliance and progress at each permanency review hearing, *see* 42 Pa.C.S. § 6351(f)(2)-(3), but some juvenile courts neglect this task. At any rate, while the juvenile court's assessment of a parent's compliance with a permanency plan is a relevant metric, in my view, the more important and telling metric is the juvenile court's assessment of the parent's progress toward alleviating the circumstances that necessitated the original placement. Simply because a parent is cooperative with services does not mean that the parent internalizes the lessons learned, changes the concerning behavior, or is able to fix the problems that led to a child's removal. Likewise, although rare, a parent deemed noncompliant with their agency-directed and court-ordered services may be able to make the necessary progress on their own.

continue to exist, and reunification is not imminent, Mother's progress early in the case simply is not a relevant consideration when assessing the elements of termination under section 2511(a)(8).

I share the Majority's desire for a more robust record in these cases. Termination of parental rights is not a technicality that occurs automatically after children are in foster care for a set number of months. No matter how much familiarity the parties, witnesses, and orphans' court have with the facts from the dependency matter, an agency-petitioner should always support its petition to terminate parental rights with a clear presentation of evidence that is derived from firsthand sources (to the extent possible) and that is tightly focused on the precise statutory elements at hand. But given our appellate role, the orphans' court's factual findings, the evidence presented at the hearing, and the legal elements that must be proven, I conclude that we have enough in the record before us to perform our appellate review.

That the orphans' court erred by finding that the conditions that led to Children's removal continued to exist is not the end of the matter. Section (a)(8) also requires a determination of whether "termination of parental rights would best serve the needs and welfare of the child." 23 Pa.C.S. § 2511(a)(8). Although section 2511(a) generally focuses on the behavior of the parent, the third prong of section 2511(a)(8) specifically "accounts for the needs of the child." *C.L.G.*, 956 A.2d at 1008-09. Similar to section 2511(a)(5), which contains an identical needs and welfare prong, the third prong of section 2511(a)(8) "is not a mere formality flowing from the existence of the

preceding [two] elements enumerated in the statute." ***See In re P.A.B.***, 570 A.2d 522, 525 (Pa. Super. 1990) (holding that the orphans' court committed an error of law by implying that satisfaction of the preceding four prongs of section 2511(a)(5) required the conclusion that termination would best serve the children's needs and welfare without considering the needs and welfare prong as a discrete consideration). Further, and in a similar fashion, under section 2511(b), the orphans' court must "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). This Court has generally followed the same legal framework to assess the third prong of subsection (a)(8) and subsection (b).[8]

---

[8] Because the orphans' court determined that CYS failed to prove grounds to terminate Mother's parental rights under section 2511(a), it did not proceed to section 2511(b). The orphans' court, however, determined that CYS did not prove that termination served Childrens' needs and welfare pursuant to section 2511(a)(8).

Section 2511 refers to the child's "needs and welfare" three times: twice as the final prong of two of the thirteen provisions listing the "grounds" for termination of parental rights in subsection (a), and once in subsection (b), which is applicable to all petitions, regardless of the particular grounds upon which the petitioner relies. ***Compare*** 23 Pa.C.S. § 2511(a)(5), (8) (including as the final element that "termination of the parental rights would best serve the needs and welfare of the child") ***with id.*** § 2511(b) (specifying that "[t]he court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child").

Although a comprehensive statutory analysis and historical overview of the statute and cases interpreting the statute is beyond the scope of this dissent, I would be remiss not to note that the "needs and welfare" language in the subsection (a)(5) and (a)(8) grounds provisions is similar, but not identical, to the language in subsection (b). Despite the General Assembly's directive for courts to interpret statutes in a manner that does not render any
*(Footnote Continued Next Page)*

This means that courts must consider the matter from each child's perspective, placing the child's "developmental, physical, and emotional needs and welfare above concerns for the parent." **K.T.**, 296 A.3d at 1105-06.  Our Supreme Court has cautioned that "the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to

---

provision superfluous and that gives effect to each provision, **see** 1 Pa.C.S. §§ 1921(a), 1922(2), appellate courts largely have ignored the language differences and have not engaged in a full statutory analysis to discern the General Assembly's intent of including multiple provisions addressing the child's needs and welfare (likely because the issue has not been squarely presented for consideration on appeal).  Instead, this Court has interpreted the needs and welfare analyses required under subsections (a)(8) and (b) to utilize the same legal standards and to be based upon the same evidence. **See C.L.G.**, 956 A.2d at 1008-09 (although recognizing that subsections (a)(8) and (b) "are distinct" and finding "we must address [s]ection 2511(a) before reaching [s]ection 2511(b)," holding that both subsections "direct us to evaluate the 'needs and welfare of the child,'" and concluding, in discussion of both subsections, that the child's needs and welfare were best served by terminating her mother's rights because she does not share a parent-child bond with her mother, she shares a parent-child bond with her foster mother, removal from her foster mother would be detrimental to the child, and adoption by foster mother would allow her to experience permanence in situation where the court determined that reunification was not imminent); **see also M.A.B.**, 166 A.3d at 448 (combining discussion of the children's needs and welfare pursuant to subsection (a)(8) and subsection (b) because the "third element of [s]ection 2511(a)(8) requires that the [o]rphans' [c]ourt conduct an analysis similar to that required under [s]ection 2511(b)"); **accord R.I.S.**, 36 A.3d at 579 n.3 (plurality) (Baer, J., concurring) (noting the similarity between the last prong of section 2511(a)(8) and section 2511(b));

Because there is no advocacy on this issue before us, and because **C.L.G.** is an en banc decision that is binding upon this panel, I must follow this Court's prior decisions that use the same legal analysis for subsections (a)(8) and (b).  And pursuant to our existing case law, both needs and welfare inquiries require courts to analyze the termination decision from the child's perspective and to prioritize the child's needs and welfare over that of the parent.

- 27 -

the best interests and the needs and welfare of the particular children involved." *In re T.S.M.*, 71 A.3d 251, 268-69 (Pa. 2013). The party seeking termination bears the burden of proving, by clear and convincing evidence, that termination of parental rights serves a child's needs and welfare. *K.T.*, 296 A.3d at 1105-06.

When determining whether the petitioner met its burden to prove that termination serves a child's needs and welfare, the orphans' court must consider, at a minimum, the factors delineated by our Supreme Court in *K.T.*, all of which are of "'primary' importance in the [s]ection 2511(b) analysis" and "may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare." *Id.* at 1109.

The orphans' court must determine whether the parent and child share an emotional bond and assess whether the bond is "necessary and beneficial" to the child, such that "maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Id.* If a bond exists, the court must ascertain the effect upon the child of severing the bond. *Id.* Because the severing of any parent-child bond may be emotionally painful for a child, the orphans' court cannot preclude termination based solely on evidence of an "adverse" or "detrimental" impact to the child. *Id.* at 1110-11. Instead, focusing upon the "child's development, and mental and emotional health," the orphans' court should assess whether severing the bond "is the kind of loss that would predictably cause extreme emotional consequences or significant, irreparable harm" to the child. *Id.*

The parent-child bond, however, is "but one part of the overall subsection (b) analysis." The orphans' court must also consider:

> the child's need for permanency and length of time in foster care consistent with [the Juvenile Act,] 42 Pa.C.S. § 6351(f)(9) and [the federal Adoption and Safe Families Act], 42 U.S.C. §§ 675(5)(C), (E); whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability.

*Id.*

When conducting "a full subsection (b) analysis focused upon the child," the orphans' court has "discretion to place appropriate weight on each factor present in the record." *Id.* at 1113. However, when "weighing the difficult factors discussed above, courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly." *T.S.M.*, 71 A.3d at 269.

Here, the orphans' court found that CYS failed to present clear and convincing evidence that termination would best serve the needs and welfare of Children pursuant to subsection (a)(8). Opinion, 8/4/2023, at 10. In support, the orphans' court reasoned that Mother loves Children, which is best evidenced by her consistent visitation, including while incarcerated. *Id*. at 11. The court also focused upon Mother's desire to parent and her efforts. *See id.* at 10-11; *see also* Statement, 9/6/2023, at 2-3.

CYS argues that the orphans' court erred in this conclusion, as our law provides that "a parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights," and Children have the superior right at this point "to have proper parenting and fulfillment of [their] potential in a permanent, healthy, safe environment." CYS's Brief at 18-19 (quoting **Z.P.**, 994 A.2d 1108, 1121 (Pa. Super. 2010); **In re B., N.M.**, 856 A.2d 847, 856 (Pa. Super. 2004)).

Once again, despite our deference to the orphans' court and our stringent standard of review, I conclude that the orphans' court erred by using an incorrect legal standard to assess Childrens' needs and welfare under the third prong of subsection (a)(8). A parent's efforts and some progress towards reunification is irrelevant to, and cannot form the basis of, a needs and welfare analysis under subsection (a)(8). **In re I.J.**, 972 A.2d 5, 12 (Pa. Super. 2009). Furthermore, like the orphans' court in **K.T.**, the orphans' court here erroneously truncated its analysis once it determined there was a "connection" between Mother and Children. **See** Opinion, 8/23/2023, at 10-11; **see also id.** at 5 (F.F. ¶¶ 42-43). "[A]n emotional bond with a parent is legally insufficient to preclude termination of parental rights without determining whether such bond is necessary and beneficial to the child and weighing the other factors present in the record." **K.T.**, 296 A.3d at 1114-15. That Mother loves Children and was "dedicate[ed] to maintaining her parental relationship with her children," **see** Statement, 9/6/2023, at 3, is insufficient

- 30 -

because children have myriad needs beyond love. **See Z.P.**, 994 A.2d at 1121.

The main flaw in the orphans' court's analysis is its examination of the termination decision solely from Mother's perspective as opposed to Children's. The orphans' court reliance on the "connection" between Mother and Children failed to even consider whether the same was true from Children's perspective. A parent-child bond is more than a shared biological connection or a parent's or child's affection towards the other; instead, it is a "bilateral relationship." **In re K.K.R.-S**, 958 A.2d 529, 535 (Pa. Super. 2008). The court emphasized Mother's love towards Children, but, despite ample evidence in the record, made no mention of Children's feelings towards Mother or the effect that Mother's behavior and struggles have had upon Children.

For example, while finding that Mother has consistently visited with Children, the orphans' court failed to note that for the past year, such visits occurred electronically over Zoom. Opinion, 8/23/2023, at 4-5 (F.F. ¶¶ 38, 42). Even Mother recognized that her ability to connect with Children from jail was strained except when Children's foster mother participated in the call to provide relevant information about their daily lives and interests. **See** N.T., 5/11-12/2023, at 214, 231-32. The counselor at the jail described the Zoom visits as "very rocky" and difficult for Children to engage in but getting better. **Id.** at 190, 197.

The orphans' court's reference to the "connection" between Mother and Children is the term used by the CYS caseworker when describing their

relationship. *Id.* at 147. Crucially, the orphans' court failed to mention the caseworker's caveated testimony that Children's connection with Mother is not always healthy. *Id.* at 147, 162. The caseworker explained that Mother does not take Childrens' feelings into consideration or allows her own feelings to predominate, which causes G.W., in particular, to shut down. *See id.* at 162-63. The orphans' court was not required to find the caseworker's testimony credible or convincing, but its failure to mention the caveats to her testimony or to analyze whether Children have a "necessary and beneficial" bond with Mother was legally erroneous. *K.T.*, 296 A.3d at 1115.

The orphans' court determined that Children have "a bond with foster mother/father, in that [Children have] been placed in their home since May 17, 2021, and [Children] identify with the foster mom/dad as [their] family." Opinion, 8/4/2023, at 4 (F.F. ¶ 41). The evidence indicates that Children are very bonded to each other and to their foster parents, who they have been with since 2021. N.T., 5/11-12/2023, at 180. While Children know that Mother is their parent, they look to their foster parents for "the typical parent connection" of guidance, safety, and structure. *Id.* at 178. The court neglected entirely to discuss Childrens' need for security, safety, and structure in its needs and welfare analysis. Furthermore, while it is true that time in care does not pre-ordain the outcome (as the orphans' court blithely noted), it is a factor that the orphans' court must consider, which the orphans' court did not do. *See K.T.*, 263 A.3d at 1110-11.

Curiously, the court made the following "finding of fact":

> Considering the connection between [Children] and Mother, there was no testimony offered whatsoever to show that this connection can be severed without irreparable harm to [Children]; nor was it proven that the trauma caused by breaking the connection is outweighed by the benefit of moving the child toward a permanent home.

Opinion, 8/4/2023, at 5 (F.F. ¶ 43). To say that CYS produced "no testimony whatsoever to show that this connection can be severed without irreparable harm to Children" without discussing the evidence CYS did produce is incongruent with the record and the law. While the petitioner presents the evidence and bears the burden of proof, it is up to the **court** to "evaluate whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare" and the "impact of severance to determine if it will pose more than an adverse or detrimental impact." **See K.T.**, 296 A.3d at 1110-11.

Based upon the orphans' court's truncated analysis, it seems as if the orphans' court was looking for a CYS witness to recite "magic words" instead of conducting its own evaluation of the evidence before it. **Accord id.** at 1114. Orphans' courts are free to find the petitioner's evidence unconvincing or incredible, or to weigh a child's necessary and beneficial bond more than the other factors announced in **K.T.** But the court's failure, as here, to discuss the evidence CYS produced and to analyze it within the needs and welfare framework is legal error. Instead, as in **K.T.**, the orphans' court in the case at bar gave no indication that it weighed the "subsection (b) considerations of

foster parent bond, preadoptive home, and need for permanency" in its analysis "despite the fact the record included relevant evidence." *Id.*

In addition to the caseworker's testimony regarding the health of their connection to Mother, evidence was admitted that showed Children's reactions towards Mother. The record reflects that G.W., the oldest child, "disconnects" around Mother. *Id.* at 88-89, 147. G.W. does not want to participate in some of the visits, shuts down around Mother, and sometimes will not acknowledge her when she speaks to him. *Id.* at 162-63, 172-73. Normally, he is a "wild, loud, crazy kiddo" who enjoys engaging in activities in the foster home, but around Mother, G.W. is "somber." *Id.* at 147. The caseworker explained that G.W. has never expressed a desire to be with Mother. *Id*. at 168. Additionally, the record reflects that G.W. is in need of trauma therapy. He is starting to disclose trauma from his past, but he typically shuts down and will not discuss specifics. *Id.* at 168. He has told the caseworker, however, that he is "always afraid" because someone touched him inappropriately in the past (prior to his placement in this foster home). *Id.* at 173.

T.W., the younger child, who has spent half her life with Mother and half her life with her foster parents, seems more torn between them. *Id.* at 169. T.W., however, has demonstrated fear when Mother has outbursts, such as when Mother was "very upset" about T.W.'s finger being pinched in the door by G.W. and ran into the courtroom holding T.W.'s finger and accusing the foster parents of abuse. *Id.* at 169, 172.

Given Children's young ages, Children's time out of Mother's care, the maintenance of the relationship only by supervised visits and fifteen-minute Zoom calls, Children's relationship with their foster parents, their need for permanency and stability, and the effect of Mother's behaviors upon Children, the record in this case facially supports a conclusion that terminating Mother's rights serves Childrens' needs and welfare under a comprehensive needs and welfare analysis. Nevertheless, our standard of review does not permit us to make factual findings from the cold record without the benefit of the orphans' court's longitudinal knowledge and firsthand credibility determinations. *See* *I.J.*, 972 A.2d at 13. Thus, I would remand the case to the orphans' court for it to conduct a comprehensive needs and welfare analysis under the proper legal standard. *Id.*

Based on the foregoing, I would vacate the orders denying CYS's petitions to terminate Mother's parental rights to Children and remand for prompt proceedings consistent with this dissent. Accordingly, I respectfully dissent.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 05/06/2024